RECEIVED

DEC 1 2 2013

JEFFERSON COUNTY
CIRCUIT CLERK

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, WEST VIRGINIA**

DAVID KNISELY,

     Plaintiff,

v.                                          Civil Action No. 13C-443

NATIONAL BETTER LIVING ASSOCIATION, INC.,
AMERICAN MEDICAL AND LIFE INSURANCE COMPANY, and
JOHN/JANE DOES,

     Defendants.

## COMPLAINT

Comes now the Plaintiff David Knisely, by and through counsel, Laura C. Davis and Skinner Law Firm, and as their Complaint against National Better Living Association, Inc., American Medical and Life Insurance Company, and John/Jane Does, the Defendants herein, states as follows:

### NATURE OF THE CASE

1.     This case concerns a concerted scheme of soliciting vulnerable consumers for junk insurance by Defendants National Better Living Association, Inc. ("NBLA"), American Medical and Life Insurance Company ("AMLI"), and John Doe Producer/Administrator Company by way of fraud, bad faith, civil conspiracy, and racketeering.

2.     In order to sell insurance, Defendants fraudulently represent the extent and nature of insurance benefits they market and sell to unsophisticated consumers as major medical coverage when, in fact, they offer only extremely limited coverage, resulting in consumers not getting the benefits promised.

3.      As a result of the misleading advertising and sales pitches, the Plaintiff, David Knisely, purchased insurance coverage from Defendant AMLI through a group policy procured by and through Defendant NBLA.

## JURISDICTION AND VENUE

4.      Plaintiff David Knisely is and was at all times relevant to matters set forth herein a resident of Harpers Ferry, Jefferson County, West Virginia.

5.      Defendant, National Better Living Association, Inc. ("NBLA") is a Georgia corporation not authorized to do business in the State of West Virginia.  Defendant NBLA markets itself as a national membership association that promotes its members' quality of life through group benefits. Defendant NBLA sells its memberships to consumers in West Virginia including the Plaintiff in this case.

6.      Defendant, American Medical and Life Insurance Company ("AMLI"), is a New York insurer authorized to do business in and doing business in the State of West Virginia.  Defendant AMLI issued and delivered a group master limited medical benefit insurance policy to the Plaintiff by and through Defendant NBLA.

7.      John Doe 1 is an unknown company authorized through a contract with Defendant NBLA and /or AMLI to market and sell the group policy through Defendant AMLI to Defendant NBLA's "membership."  John Doe 1 solicits consumers in West Virginia, including the Plaintiff in this case.

8.      This Court has jurisdiction over all of the Defendants in this case, and venue is proper in Jefferson County.

2

## FACTUAL ALLEGATIONS

### Allegations Common to All Counts

9.      Defendants NBLA, AMLI, and John Doe 1 entered into an agreement, orchestrated by NBLA and its officers and directors, to prey on vulnerable consumers most in need of health insurance through aggressive and fraudulent sales tactics in order to swindle what little money the consumers had.

10.      At all relevant times, each Defendant was the principal, agent, servant, or employee, or was otherwise contractually obligated to the others, creating legal relationships whereby legal liability can be imputed from one Defendant to another.

11.      Defendant AMLI issued a group health insurance policy to Defendant NBLA for the benefit of NBLA's members, including members residing in the State of West Virginia.

12.      Although Defendant NBLA holds itself out as providing multiple "valuable benefits" to its membership, the only significant benefit it offered was insurance coverage under its group policy with Defendant AMLI.

13.      With Defendant NBLA's and Defendant AMLI's full knowledge, Defendant John Doe 1 marketed and sold this insurance as comprehensive medical coverage, including catastrophic coverage, when in fact, it provided only very limited medical benefits.  Among other things, the advertising and marketing of the NBLA/AMLI group policy misrepresented the policy as having no exclusions for pre-existing conditions.

3

14.    Defendant NBLA and Defendant AMLI, through their agent and co-venturer John Doe Producer/Administrator Company, preyed upon the vulnerabilities of people who either had trouble qualifying for, or had trouble affording, traditional comprehensive health insurance coverage by falsely presenting the NBLA membership / AMLI policy as a low cost way to obtain full insurance coverage.

15.    NBLA's advertising offered to give reasonable quotes on comprehensive health insurance policies, and when potential insurance consumers telephoned NBLA, they were connected to John Doe 1 solicitors in call centers that made false and misleading representations regarding coverage to convince consumers that they could cheaply obtain comprehensive medical coverage. During the conversation the solicitor obtained the personal information of the consumers, including banking information. These phone calls between John Doe 1 solicitors and consumers were not recorded.

16.    After the sales were made and personal information was exchanged during the unrecorded conversations, the calls were transferred to an AMLI insurance agent who would speedily recite confusing and incomprehensible disclaimers in recorded conversations.

17.    Those who joined NBLA, including the Plaintiff, did so for the purpose of obtaining comprehensive health insurance.

18.    All of the Defendants knew that those who joined NBLA, including the Plaintiff, did so for the purpose of obtaining comprehensive health insurance.

19.    Defendant NBLA was the focus of a Dateline NBC investigation into fraudulent practices, which aired on March 25, 2012. In the investigation, NBC revealed

4

the fraudulent telemarketing of NBLA membership plans to consumers trying to obtain comprehensive medical coverage and told the stories of two people who were duped into signing up with NBLA, and then denied coverage when medical treatment was needed.

20.     The Defendants' actions toward the Plaintiff were clearly part of a scheme, pattern, and conspiracy pursued for the purpose of maximizing the amount of money received in premiums and dues payments and minimizing the amount of money paid out in claims.

21.     For the purpose of maximizing profits to be derived from the fraudulent marketing of the "limited benefit" policies, the Defendants further agreed to and participated in a scheme, pattern and undertaking to systematically deny and/or underpay and/or delay payment of claims made for benefits under the policies.

22.     The scheme, pattern and undertaking to deny, delay and under pay claims included but was not limited to the following: 1) disguising which entity was responsible for responding to or which person within which entity was responsible for responding to or answering questions about claims; 2) routinely denying claims; 3) misapplying the pre-existing limitation; 4) singling out and misusing billing and diagnosis code information to mis-classify claims as either excluded or subject to significant payment limitations under the policy; 5) delaying responses to claims and policyholder calls for weeks; 6) denying that members were still members of the plan when they were in fact still members; and 7) falsely stating that the members had not filed their claim on time.

23.     The Defendants' pattern of fraudulent conduct has resulted in hundreds of consumer complaints against the Defendants across the nation including civil and

administrative actions in at least the following states: Alaska, Arkansas, Florida, Georgia, Kentucky, Maine, Maryland, Michigan, Montana, New York, Utah, and Wisconsin.

24.     In 2009, the Alaska Insurance Commissioner fined AMLI for unlawful practices and required AMLI to return all premiums to the consumers affected. (**Exhibit A**)

25.     In 2010, the Arkansas Insurance Commissioner suspended Cinergy Health, Inc. from marketing insurance for AMLI. (**Exhibit B**)

26.     In October 2010, the Florida Office of Insurance Regulation issued a finding that Defendant AMLI's advertising and marketing was misleading and falsely implied that Defendant AMLI's limited medical benefits plan was a comprehensive medical plan.  In 2012, the Florida Office of Insurance Regulation fined AMLI for "[m]isrepresentation of the benefits, advantages, conditions, or terms of an insurance policy." (**Exhibit C**)

27.     An ongoing investigation the Georgia Bureau of Insurance has implicated NBLA, AMLI, and dozens of other affiliated people and entities, for multiple violations of Georgia law against hundreds of individuals who signed up for NBLA benefit plans. (**Exhibit D**)

28.     In 2010, the State of Kentucky fined AMLI and ordered restitution for its use of unlawful false advertisements and use of unauthorized third party administrators. (**Exhibit E**)

29.     In 2012, Maine's Bureau of Insurance implicated AMLI in fraudulent activities in an order revoking an affiliate of AMLI, Cinergy Health, Inc.'s license to sell insurance in the state of Maine. (**Exhibit F**)

30.     In 2010, the Maryland Insurance Commissioner fined AMLI for violating Maryland insurance law by enrolling residents into illegal group benefit plans.  (**Exhibit G**)

31.     In 2012, the Michigan Office of Financial Insurance Regulation suspended AMLI's license to sell insurance in the State of Michigan and ordered AMLI to compensate consumers. (**Exhibit H**)

32.     In 2012, the Montana Commissioner of Securities and Insurance, upon a lengthy investigation of NBLA and its affiliates, ordered NBLA to cancel all business in the state and barred NBLA from selling benefit plans in the state. (**Exhibit I**)

33.     In an ongoing lawsuit in the United States District Court for the District of Montana, three plaintiffs have alleged that NBLA and/or its affiliates were unjustly enriched by 1) violating the federal Racketeering and Corrupt Organizations Act by engaging in a systematic pattern of racketeering activity, 2) defrauding health insurance consumers, 3) breaching contractual obligations, and 4) intentionally and negligently misrepresenting material facts regarding insurance coverage. (**Exhibit J**)

34.     In July 2009, the New York State Insurance Department sanctioned and fined Defendant AMLI for fraudulent sales practices, including promising non-existent coverage for pre-existing conditions and falsely implying that the limited medical benefits plans it offered were comprehensive.  The State of New York indefinitely

suspended Defendant AMLI from writing limited medical benefit insurance in the State of New York. (**Exhibit K**)

35.     In 2011, the Utah Insurance Department ordered Defendant AMLI to pay forfeitures for, among other infractions, using unlicensed producers and illegal marketing practices. (**Exhibit L**)

36.     In an ongoing class action lawsuit in the United States District Court for the Western District of Wisconsin, plaintiffs on behalf of themselves and those similarly situated have filed suit against AMLI and associated companies alleging fraud and bad faith. (**Exhibit M**)

### Facts of the Named Plaintiff's Case

37.     Plaintiff, David Knisely, who suffers from several severe medical conditions, lost his employment in Florida and moved to Virginia.

38.     In 2011, Plaintiff moved from Vienna, Virginia, to Harpers Ferry, West Virginia.

39.     Plaintiff moved into the house jointly owned and occupied by his brother, John James Knisely and close family friend, Don Mock.

40.     At the time, Plaintiff had COBRA insurance through his former employer, but the premiums were exorbitant in comparison to his insurance.

41.     Plaintiff began to search for health care insurance coverage and specifically for insurance that would cover his pre-existing conditions.

42.     Sometime in early 2011, Plaintiff contacted Jane Doe No. 2, who gave Plaintiff the impression that she was taking the call on behalf of an insurance company.

43.   In fact, Defendant Jane Doe No. 2 was an employee or agent of Defendant NBLA and/or John Doe 1 attempting to sell Plaintiff a membership in a limited medical benefit insurance group plan offered through Defendant AMLI.

44.   Plaintiff, whose medical condition made finding insurance coverage critical, expressed interest in the plan and explained the nature of his pre-existing condition to Jane Doe No. 2.

45.   Despite the limited nature of the plan, Defendant Jane Doe No. 2 assured Plaintiff that the insurance coverage she described covered pre-existing conditions.  In fact, Defendant Jane Doe 2 told the Plaintiff that his doctor visits, medications, outpatient procedures, and lab work would all be covered.

46.   Defendant Jane Doe No. 2 further told Plaintiff that he could cancel the plan for any reason within thirty days of enrolling.

47.   Relying on Defendant Jane Doe No. 2's statements, Plaintiff was persuaded to enroll in the NBLA group plan.

48.   Mr. Mock, Plaintiff's roommate, gave the Plaintiff permission to use his bankcard to make a one-time withdrawal of $379 for NBLA's initiation/activation fee.

49.   Plaintiff explicitly advised Jane Doe 2 that Mr. Mock's account was only to be used for the activation/enrollment fee and that NBLA must bill Plaintiff directly for subsequent payments; Defendant Jane Doe No. 2 agreed to that arrangement.

50.   After receiving the plan materials in the mail, Plaintiff discovered that none of Jane Doe 2's representations about the plan were true; in addition to other things,

9

Plaintiff discovered that his necessary medications were not on the list of medications covered by the plan.

51.    Within the thirty-day cancellation period, Plaintiff contacted Defendant NBLA by telephone and informed John Doe No. 3 that he was cancelling his coverage.

52.    John Doe No. 3 told Plaintiff that the coverage was cancelled, effective immediately.

53.    Plaintiff never received any further communication from Defendants NBLA or AMLI.

54.    Plaintiff never received any bill or other statement from NBLA or AMLI concerning his plan or available insurance coverage.

55.    On or around February 23, 2012, Plaintiff was hospitalized for an extreme allergic reaction to a drug protocol he was administered for his chronic medical condition. While in the Hospital, the Plaintiff contracted MRSA, required several weeks of hospitalization, and was not discharged until April 11, 2012.

56.    Plaintiff's hospital stay resulted in medical bills totaling more than $60,000.

57.    In late 2012, Plaintiff's friend and roommate, Mr. Mock, informed Plaintiff that he had discovered that NBLA had withdrawn funds from Mr. Mock's account; unbeknownst to Mr. Mock or the Plaintiff, NBLA had made unauthorized withdrawals from Mr. Mock's account for thousands of dollars over an 18-month period.

58.    Plaintiff contacted NBLA to discuss the situation and spoke to Jane Doe No. 4, who identified herself only as "Ms. Smith."

59.     Plaintiff informed "Ms. Smith" that he had cancelled his coverage through NBLA within the introductory period in May of 2011. Plaintiff advised that NBLA never had the authority to withdraw funds from Mr. Mock's account, aside from the initiation fee, which was supposed to be refunded.

60.     "Ms. Smith" told Plaintiff that his membership had not been cancelled and it was still in effect.

61.     Plaintiff demanded that NBLA either refund the over $8,000 that had been illegally deducted from Mr. Mock's account or pay his medical bills.

62.     "Ms. Smith" summarily denied Plaintiff's claim on the basis that the Plaintiff's claims allegedly fell outside of the mandatory reporting period and because he had not reported the claim to the proper entity, AMLI, within the reporting period.

63.     Only after the phone conversation between Plaintiff and "Ms. Smith" did NBLA send Plaintiff correspondence and insurance cards in December 2012. Prior to that, Plaintiff had received no notice from either AMLI or NBLA advising him of his continuing membership or coverage.

64.     Because the NBLA membership was an insurance scam and provided no real coverage benefits, Plaintiff cancelled his NBLA membership in January of 2013.

65.     In May of 2013, Mr. Knisely's counsel contacted "Ms. Smith" to discuss his NBLA membership and coverage.  (A copy of the letter confirming the conversation is attached as **Exhibit N**).

66.     On May 14, 2013, John Oxendine on behalf of NBLA wrote Mr. Knisely's counsel and confirmed that NBLA had never forwarded Mr. Knisely's medical claim to AMLI.  (A copy of NBLA's attorney's letter is attached as **Exhibit O**).

67.     On May 28, 2013, Mr. Knisely's counsel forwarded correspondence to NBLA's counsel, John Oxendine, disputing his representations concerning their conversation and again requesting information concerning NBLA and AMLI. (Find correspondence attached as **Exhibit P**).

68.     On May 23, 2013, Mr. Knisley through counsel contacted an AMLI representative to discuss his claim but was advised that they could not without a HIPAA authorization.   (Find confirmatory letter from Mr. Knisely's counsel, attached as **Exhibit Q**).

69.     After providing AMLI a signed authorization, Mr. Knisely's counsel provided AMLI numerous bills and records and requested reimbursement for all charges. However, to date, no AMLI adjuster has ever contacted Mr. Knisely's counsel regarding his claim.

### Count I – Count One – Violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962 (c) and 1962 (d)) (All Defendants)

70.     Plaintiff herein incorporates all allegations above.

71.     This Claim for relief is asserted against all Defendants and arises under 18 U.S.C. §§ 1962 (c) and (d) of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

72.    At all relevant times each of the Defendants was a "person" within the meaning of 18 U.S.C. § 1961(3), as each of the Defendants was "capable of holding a legal or beneficial interest in property."

73.    At all relevant times the Defendants collectively constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4); the "Enterprise" consisted of NBLA, AMLI, John and Jane Does, and affiliated persons.

74.    Each of the Defendants are associated with the Enterprise.

75.    Each of the Defendants helped to direct the Enterprise's actions and manage its affairs.

76.    Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

77.    Defendants' multiple predicate acts of racketeering, include mail fraud, wire fraud and bank fraud in violation of 18 U.S.C. §§ 1341, 1343 and 1344.

78.    The Defendants engaged in a scheme of mail and wire fraud to defraud Plaintiff.

79.    The Enterprise's scheme involved the suppression of information, lies, fraudulent misrepresentations and omissions all calculated to deceive consumers of ordinary prudence and comprehension.

80.    Defendants executed their scheme through a series of predicate acts through the United States mails and through transmissions by wire communications (e-mails,

13

telephone calls, radio advertisements, television advertisements, and internet advertisements) in interstate commerce.

81.     The Enterprise committed bank fraud (18 U.S.C. §1344) by obtaining funds, owned by Mr. Mock, and under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises.

82.     The Defendants' violations of 18 U.S.C. §§ 1962 (c) and (d) have directly and proximately caused Plaintiff to incur significant injuries.

83.     The Defendants each, as a result of their participation in the racketeering Enterprise, have received money from the ill-gotten gains of the Enterprise.

84.     Under the provisions of 18 U.S.C. § 1964 (c), the Plaintiff is entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees; and equitable relief, pursuant to 18 U.S.C. § 1964(a), in the form of disgorgement of profits, and assets.

## Count II – Violations of the West Virginia Unfair Trade Practices Act (All Defendants)

85.     Plaintiff herein incorporates all allegations above.

86.     In the handling of the Plaintiff's insurance claim, the Defendants have jointly and severally committed multiple violations of W. Va. Code § 33-11-1 et seq., and the insurance regulations promulgated thereunder.

87.     The Defendants violated W. Va. Code §§33-11-4(1)(a) and (e) by misrepresenting pertinent facts and insurance policy provisions. W. Va. Code §33-11-4(1) states that "No person shall make, issue, circulate, or cause to be made, issued or

14

circulated, any estimate, circular, statement, sales presentation, omission or comparison

which:

     (a) Misrepresents the benefits, advantages, conditions or terms of any

insurance policy; or . . .

     (e) Uses any name or title of any insurance policy or class of insurance

policies misrepresenting the true nature thereof."

88.    The Defendants violated W. Va. Code § 33-11-4(2) through false

advertising and disseminating false information about the product they were selling. W.

Va. Code § 33-11-4(2) (false information and advertising generally) states:

> No person shall make, publish, disseminate, circulate or place before the
> public, or cause, directly or indirectly, to be made, published, disseminated,
> circulated or placed before the public, in a newspaper, magazine or other
> publication, or in the form of a notice, circular, pamphlet, letter or poster or
> over any radio or television station, or in any other way, an advertisement,
> announcement or statement containing any assertion, representation or
> statement with respect to the business of insurance or with respect to any
> person in the conduct of his insurance business, which is untrue, deceptive
> or misleading.

89.    The Defendants violated W. Va. Code §33-11-4(9)(a) by misrepresenting

pertinent facts and insurance policy provisions relating to Plaintiff's insurance coverage.

90.    The Defendants violated W. Va. Code §33-11-4(9)(b) by failing to

acknowledge and act reasonably promptly upon communications with respect to claims

arising under insurance policies.

91.    The Defendants violated W. Va. Code §33-11-4(9)(b) by failing to adopt

and implement reasonable standards for the prompt investigation of claims arising under

insurance policies.

92.     The Defendants violated W. Va. Code §33-11-4(9)(d) by refusing to pay claims without conducting a reasonable investigation based upon all available information.

93.     By failing to disclose and by concealing provisions of the "benefit plan" along with multiple coercive statements as time limits for notifications of claims, the Defendants violated W. Va. CSR § 114-14-4 which states:

> 4.1. No person may knowingly fail to fully disclose to first-party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented.
>
> 4.2. Concealment of pertinent policy provisions. -- No person may knowingly conceal from first-party claimants benefits, coverages or other provisions of any insurance policy or insurance contract when such benefits, coverages or other provisions are pertinent to a claim.
>
> 4.3. Coercive statements. -- No person may make statements which indicate that the rights of a claimant may be impaired if a form or release is not completed within a given period of time unless the statement is given for the purpose of notifying the claimant of the provisions of a statute of limitation or of a policy or contract time limit.
>
> 4.4. Time limit for notification of claim. -- Except where a time limit is specified by statute or legislative rule, no insurer may require a first-party claimant to give notification of a claim or proof of claim within a specified time.

94.     The Defendants violated the above referenced provisions of W. Va. Code §33-11-4(9), and the insurance regulations promulgated thereunder, as a general business practice in this and other claims.

95.     As a direct and proximate result of the Defendants' violations of W. Va. Code § 33-11-1 et seq., and the insurance regulations promulgated thereunder, Plaintiff

was harmed and is entitled to recover economic and non-economic damages, including

attorney's fees and expenses in the handling of Plaintiff's claim.

96.     Defendants' illegal acts and omissions in handling the Plaintiff's claim

amount to willful, wanton and malicious conduct that also entitles the Plaintiff to punitive

damages.

### Count III – (Defendant NBLA) Violations of the Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations Act

97.     Plaintiff herein incorporates all allegations above.

98.     Defendant NBLA is a "discount medical organization" pursuant to W. Va.

Code § 33-15E-3(6) of the Discount Medical Plan Organizations and Discount

Prescription Drug Plan Organizations Act:

> "Discount medical plan organization" means an entity that contracts with
> providers, provider networks or other discount medical plan organizations
> to offer access to medical or ancillary services at a discount to plan
> members, provides access for discount medical plan members to the
> services in exchange for fees, dues, charges or other consideration, and
> determines the charges to plan members.

99.     Defendant John Doe 1 is a "Marketer" pursuant to W. Va. Code § 33-15E-

3(6) of the Discount Medical Plan Organizations and Discount Prescription Drug Plan

Organizations Act.

100.    Plaintiff is a "Member" pursuant to W. Va. Code § 33-15E-3(13) of the

Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations

Act.

101.    The purpose of the Discount Medical Plan Organizations and Discount

Prescription Drug Plan Organizations Act (W. Va. Code § 33-15E-1 et seq.) is to "to

establish standards for discount medical plan organizations . . . in order to better protect consumers from unfair or deceptive marketing, sales and enrollment practices and to facilitate consumer understanding of the role and function of the organizations in providing access to medical or ancillary services." W. Va. Code § 33-15E-2.

102.   The Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations Act regulates discount medical plans, providers, and marketers in order to protect consumers. One such requirement is that "[a] person is required to obtain a license prior to doing business in this State as a discount medical plan organization." W. Va. Code § 33-15E-2.

103.   NBLA is not licensed, nor has it ever been licensed to do business in the state of West Virginia.

104.   Each licensed discount medical plan organization shall maintain in force a surety bond in its own name, in an amount not less than thirty-five thousand dollars, in favor of the commissioner for the benefit of any person who is damaged by any violation of this article. W. Va. Code § 33-15E-2.

105.   Plaintiff has been damaged by Defendants' violations of Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations Act including W. Va. Code § 33-15E-2; and §§ 33-15E-15(a, b)

106.   The Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations Act, provides for additional administrative penalties (§ 33-15E-14) and criminal penalties (§ 33-15E-15).

107.    As a direct and proximate result of the Defendants' violations of West Virginia Code § 33-15E-1 et seq. Plaintiff was damaged and is entitled to recover all damages allowed by law.

### IV – Bad Faith and Breach of Contract (Defendant AMLI)

108.    Plaintiff herein incorporates all allegations above.

109.    With any insurance contract, there exists a duty of good faith and fair dealing that runs between an insurer and its insured.

110.    Under West Virginia law, AMLI owed the Plaintiff the duty of good faith and fair dealing pursuant to the insurance policy / benefit plan.

111.    The insurance policy / benefit plan was a contractual arrangement between NBLA, AMLI and the Plaintiff.

112.    AMLI breached its duty of good faith and fair dealing to the Plaintiff, which has resulted in damages for which AMLI is legally responsible.

113.    Defendant NBLA failed to cancel the Plaintiff's AMLI insurance policy when he notified it of cancelation, and then, in bad faith, failed to properly adjust his claim and instead summarily denied it.

114.    Defendant AMLI was presented with Plaintiff's insurance claim and has never paid any benefits.

115.    As a result of NBLA and AMLI's breach of contract, breach of the duty of good faith and fair dealing, and other wrongful conduct, the Plaintiff is entitled to *Hayseeds* damages, attorneys fees, costs, and damages for annoyance and inconvenience for being forced to sue to obtain coverage, and for other compensatory damages for the

insurer's first party bad faith. *Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, (1986).

### Count V – Fraud

116.   Plaintiff herein incorporates all allegations above.

117.   As described under Count One above, Defendants, through a series of communications of material false information, induced the Plaintiff to enroll in the NBLA "benefit plan."

118.   Defendants concealed material information in order to induce the Plaintiff to enroll in in the NBLA "benefit plan."

119.   Defendant NBLA made false statements concerning the cancellation of the Plaintiff's enrollment in the NBLA plan.

120.   Defendant NBLA continued to withdraw money from a bank account after the Plaintiff told it to cancel the plan and concealed the payments from the Plaintiff.

121.   As a direct and proximate cause of the Defendants' false statements and concealment of material facts, the Plaintiff has suffered injury and is entitled to all damages allowed by law, including punitive damages.

### Count VI – Unconscionability

122.   Plaintiffs herein incorporate all allegations above.

123.   The Defendants' conduct in fraudulently inducing the Plaintiff into purchasing falsely marketed goods was unconscionable.

124.   As a result, the contract entered into by the Plaintiff with Defendants to pay for the falsely marketed products was unconscionable.

20

125.   As a result of the Defendants' unconscionable conduct, Plaintiff has suffered enormous injuries and is entitled to recover all damages allowed by law.

## Demand

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.   Awarding damages and compensation in an amount to be determined by a jury.

2.   Ordering damages pursuant to all of the relevant state statutory damages claims asserted herein.

3.   Ordering treble damages pursuant to 18 U.S.C. § 1964 (c).

4.   Ordering disgorgement of profits pursuant to 18 U.S.C. § 1964 (a).

5.   Awarding punitive damages for Defendants' willful indifference to the victim of the Defendants' activities in order to deter such conduct in the future.

6.   Ordering pre and post-judgment interest and all costs, as provided by law.

7.   Awarding the Plaintiff his reasonable attorneys' fees and costs.

8.   Granting such other and further relief as the Court deems equitable, just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

<u>**DAVID KNISELY**</u>
**BY COUNSEL**

Laura C. Davis (WV No. 7801)
Andrew C. Skinner (WV No. 9314)
Stephen G. Skinner (WV No. 6725)
Skinner Law Firm
Counsel for Plaintiff
P.O. Box 487
Charles Town, WV 25414
(304) 725-7029