# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA MARTINSBURG

**DAVID KNISELY,**

        Plaintiff,

**v.**                            **CIVIL ACTION NO.: 3:14-CV-15 (GROH)**

**NATIONAL BETTER LIVING ASSOCIATION, INC., AMERICAN MEDICAL AND LIFE INSURANCE COMPANY, and JOHN/JANE DOES,**

        Defendants.

## MEMORANDUM OPINION AND ORDER DENYING AS MOOT MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT, GRANTING IN PART MOTION FOR LEAVE TO FILE REVISED AMENDED COMPLAINT, DENYING RULE 12(b)(2) MOTION TO DISMISS, AND DENYING AS MOOT RULE 12(b)(6) MOTION TO DISMISS

Currently pending before the Court are Plaintiff David Knisely's Motion for Leave to File an Amended Complaint [ECF 80], Knisely's Motion for Leave to File Revised Amended Complaint [ECF 147] and Defendant National Better Living Association, Inc.'s ("NBLA") Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2) and (6) [ECF 91]. Having considered these motions, the Court **DENIES AS MOOT** the Motion for Leave to File an Amended Complaint, **GRANTS IN PART** the Motion for Leave to File Revised Amended Complaint, **DENIES WITHOUT PREJUDICE** the Rule 12(b)(2) Motion to Dismiss and **DENIES AS MOOT** the Rule 12(b)(6) Motion to Dismiss.

# I. Background[1]

This case concerns an alleged scheme to sell members of NBLA a junk health insurance policy offered by American Medical and Life Insurance Company ("AMLI"). Plaintiff David Knisely purchased one such policy. Based on that purchase, Knisely filed suit against NBLA, AMLI and John/Jane Does in West Virginia state court on December 12, 2013. His complaint raised the following claims: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all defendants; (2) violations of the West Virginia Unfair Trade Practices Act ("UTPA") under West Virginia Code § 33-11-4 against all defendants; (3) violations of the Discount Medical Plan Organizations and Discount Prescription Drug Plan Act Organization Act ("the Plan Act") under West Virginia Code § 33-15E-1 against NBLA; (4) bad faith and breach of contract against AMLI; (5) fraud against all defendants; and (6) unconscionability against all defendants.

On January 29, 2014, NBLA and AMLI removed this case to this Court. NBLA moved to dismiss the complaint for lack of personal jurisdiction and failure to state a claim upon which relief can be granted while AMLI moved for judgment on the pleadings. In responding to these motions, Knisely stated that, if the Court was inclined to dismiss any part of his complaint, he would request leave to amend it.

On August 19, 2014, the Court issued a memorandum opinion and order granting in part NBLA's motion to dismiss and AMLI's motion for judgment on the pleadings and denying Knisely's motion to amend his complaint. In granting NBLA's motion to dismiss

---

[1] The Court's August 19, 2014 Memorandum Opinion and Order Granting in Part NBLA's Motion to Dismiss, Granting in Part American Medical and Life Insurance Company's Motion for Judgment on the Pleadings, and Denying Plaintiff's Motion to Amend details the factual allegations of Knisely's live complaint.

in part, the Court dismissed the RICO claims asserted against NBLA and granted NBLA leave to file a motion to dismiss concerning whether this Court can exercise personal jurisdiction over it without the RICO claims. Given the personal jurisdiction issue, the Court denied the remainder of NBLA's motion to dismiss without prejudice and granted NBLA leave to refile it should the Court find personal jurisdiction proper. In granting AMLI's motion for judgment on the pleadings in part, the Court dismissed the RICO claim, the bad faith and breach of contract claim, and the UTPA claims brought under § 33-11-4(1)(a), (1)(e) and (2) against AMLI. The Court denied the motion to dismiss the UTPA claims based on § 33-11-4(9) and Rule § 114-14-4. Finally, the Court denied the motion as moot concerning the fraud and unconscionability claims because Knisely withdrew them as to AMLI. Finally, construing Knisely's request to amend his complaint as a motion since he sought such relief, the Court denied the request based on Knisely's failure to attach a proposed amended complaint as required by the Local Rules.

Following that ruling, on September 8, 2014, Knisely filed the pending motion for leave to amend his complaint. On September 11, 2014, AMLI's counsel moved to withdraw from representing AMLI. On September 18, 2014, NBLA filed the instant motion to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted under Rules 12(b)(2) and (6). Knisely responded opposing this motion, and NBLA replied.

Also on September 18, the Court scheduled a hearing concerning the motion of AMLI's counsel to withdraw. Leading up to the hearing, AMLI filed two motions to stay, one *pro se* and a second through counsel, while Knisely moved to continue the scheduling order. The Court ordered that it would take up these motions at the hearing as well. On October 21, 2014, the Court conducted the hearing and granted the motion to withdraw.

Then, the Court denied AMLI's motions to stay because it could not proceed without counsel. However, the Court stayed this matter until December 22, 2014 to allow AMLI time to obtain new counsel and ordered that counsel appear on AMLI's behalf by January 21, 2015. Given the stay, the Court denied Knisely's motion to continue the scheduling order. On December 23, 2014, the Court lifted the stay. AMLI's deadline to obtain counsel then passed without new counsel appearing on its behalf. Thus, on January 26, 2015, the Court granted Knisely leave to move for a default judgment against AMLI.

On February 6, 2015, Knisely filed the pending motion for leave to file a revised amended complaint. This document is truly an amended motion for leave to amend the complaint because, in it, Knisely seeks leave to file a different version of the proposed amended complaint. NBLA filed a response opposing this motion, and Knisely replied. To date, AMLI has not responded to either motion to amend or appeared by new counsel.

## II. Standards of Review

### A. Motion to Amend Complaint

A plaintiff may amend his complaint "once as a matter of course . . . within 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(B). After that, he may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Because the time to amend as of course has elapsed and the defendants have not consented to the amendment, Knisely needs this Court's leave to amend his complaint.

Courts "should freely give leave when justice so requires." Id. A court should deny leave to amend "only when the amendment would be prejudicial to the opposing party,

4

there has been bad faith on the part of the moving party, or the amendment would be futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir.1986). Delay alone does not suffice to deny leave to amend. Id. Rather, prejudice, bad faith, or futility must accompany the delay. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999).

The Fourth Circuit has stated the following concerning the prejudice inquiry:

> Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing. A common example of a prejudicial amendment is one that "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial." An amendment is not prejudicial, by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred.

Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006) (citations omitted). Further, "[a]n amendment is futile if the proposed claim would not withstand a motion to dismiss." Woods v. Bennett, Civil Action No. 2:12-03592, 2013 WL 4779018, at *3 (S.D. W. Va. Sept. 5, 2013) (citing Perkins v. United States, 55 F.3d 910, 917 (4th Cir.1995)).

**B.      Rule 12(b)(2) Motion to Dismiss**

A non-resident defendant challenges a court's power to exercise personal jurisdiction over it through a Rule 12(b)(2) motion to dismiss. When faced with a Rule 12(b)(2) motion, the plaintiff has the burden of proving "'the existence of a ground for jurisdiction by a preponderance of the evidence.'" In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997) (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). But, "[w]here, as here, the district court addresses the question of personal jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the complaint, the plaintiff bears the burden of making a prima facie showing of a sufficient jurisdictional

basis to survive the jurisdictional challenge." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 276 (4th Cir. 2009). "In considering whether the plaintiff has met this burden, the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014) (citation and quotation marks omitted).

### C.    Rule 12(b)(6) Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows a defendant to challenge the complaint's sufficiency in this regard by moving to dismiss a complaint for failing "to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although Rule 8's pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancements.'" Id. (quoting Twombly, 550 U.S. at 555, 557).

When reviewing a Rule 12(b)(6) motion, courts assume that the complaint's well-pleaded allegations are true, resolve all doubts and inferences in favor of the plaintiff and view the allegations in a light most favorable to the plaintiff. Edwards, 178 F.3d at 243-44.

Only factual allegations receive the presumption of truth. Iqbal, 556 U.S. at 678-79. A court may also consider facts derived from sources beyond the four corners of the complaint, including documents attached to the complaint, documents attached to the motion to dismiss "so long as they are integral to the complaint and authentic" and facts subject to judicial notice under Federal Rule of Evidence 201. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

### III. Discussion

#### A.    Motions to Amend

Before addressing whether to grant Knisely leave to amend his complaint, the Court addresses two issues. First, there is some confusion concerning whether the August 19, 2014 Order denied Knisely's motion to amend his complaint with or without prejudice. The Court clarifies that its Order denied this motion without prejudice for failure to attach a proposed amended pleading as required by the Local Rules. See Williams v. Wilkerson, 90 F.R.D. 168, 170 (E.D. Va. 1981) (denying motion to amend for failure to comply with local rules without prejudice). This motion therefore is properly before the Court. Second, the Court denies the initial motion to amend as moot because Knisely has revised it. Thus, the Court will consider Knisely's most recent motion to amend while recognizing that the parties' briefing incorporates their arguments regarding the initial motion to amend.

NBLA argues that the proposed amended complaint is brought in bad faith, would prejudice NBLA and is futile.

Knisely seeks to amend his complaint to do three things. First, he aims to remedy the deficiencies the Court noted when ruling on NBLA's initial motion to dismiss and AMLI's

motion for judgment on the pleadings. Second, Knisely seeks to add Allied Health Benefits, Inc., CorpSavers Healthcare, Inc., Premiere Administrative Solutions, Inc., Timothy Siewart, G. Daniel Siewart, III, Michael Siewart, Angus Morrison, George Spalding, Landon Jordan and Jess Jordan as defendants. Knisely alleges that discovery has shown that these individuals devised the alleged insurance scam and ran it through NBLA using Allied Health Benefits, CorpSavers and Premiere Administrative Solutions. Third, Knisely seeks to modify his claims to the following: (1) RICO violations against AMLI and the proposed new defendants; (2) UTPA violations under West Virginia Code § 33-11-4(9) and Rule § 114-14-4 against NBLA, AMLI and Premiere Administrative Solutions; (3) Plan Act violations against NBLA, Allied Health Benefits and CorpSavers; (4) bad faith and breach of contract against AMLI; (5) fraud against NBLA, AMLI, Allied Health Benefits, CorpSavers and Premiere Administrative Solutions; and (6) indemnification against all defendants.

The proposed amended complaint makes the following factual allegations. On March 25, 2011, while living in West Virginia, Knisely saw a television advertisement for health insurance through NBLA that would meet his needs. Proposed Am. Compl. ¶¶ 36, 38. Knisely had a chronic medical condition and was paying high premiums for his former employer's insurance through COBRA. Id. ¶ 36. He called the toll-free number advertised and left his contact information. Id. ¶ 38. Sheila Sanchez returned Knisely's call. Id. ¶ 39. Sanchez worked at a call center to sell NBLA memberships at the direction of NBLA, AMLI, Allied Health Benefits, CorpSavers and Premiere Administrative Solutions. Id. She told Knisely that an NBLA membership offered a group health insurance policy with AMLI that covered his pre-existing medical conditions even though it would not. Id. ¶ 41. Knisely purchased an NBLA membership and the policy and gave Sanchez the bank account

information of Don Mock, his roommate, for the activation fee on the condition that NBLA not charge the account for anything else.  Id. ¶¶ 42-44.  Sanchez agreed to only use Mock's account for the activation fee and stated NBLA would bill Knisely thereafter.  Id. ¶ 42.  Sanchez then transferred Knisely to James Benjamin Lord.  Id. ¶ 43.  Lord worked at the call center to market and sell the AMLI policy to West Virginia residents.  Id.  In this part of the call, Lord made more misrepresentations about the membership and policy and read various confusing disclaimers.  Id. ¶¶ 46–50.

After enrolling, Knisely tried to use the insurance at his doctor's office and learned that it did not cover anything.  Id. ¶ 54.  With this information, Knisely called NBLA on April 4, 2011 to complain that he had been misled about the policy and asked to cancel his membership.  Id. ¶ 55.  Knisely called NBLA again on April 18, 2011 to cancel his membership.  Id. ¶ 56.  Brandon Holmes, an employee of Allied Health Benefits and CorpSavers, answered and told Knisely that he needed to complete a cancellation form. Id.  Knisely objected to filling out the form.  Id. ¶ 57.  Holmes responded that he had cancelled Knisely's membership, effective immediately, but NBLA continued to deduct approximately $385.83 per month from Mock's bank account until January 2013. Id. ¶¶ 58-59.  Knisely was unaware of these deductions because Mock did not routinely review his bank statement.  Id. ¶¶ 64, 66.

Beginning on February 23, 2012, Knisely was hospitalized for 37 days for an extreme allergic reaction and MRSA.   Id. ¶¶ 60-61, 73.  His medical bills exceeded $100,000.  Id. ¶ 62.  He did not submit insurance information for these bills because he still thought that NBLA had cancelled his membership.  Id. ¶ 63.  Knisely alleges AMLI should have reimbursed him for $30,000 of these bills because its policy covered $1,000 per day

of hospitalization for up to 30 days.  Id. ¶ 73.

In December 2012, Mock reviewed his bank statement and discovered NBLA was still taking funds from it.  Id. ¶ 64.  Mock called NBLA on December 11, 2012 and demanded a refund.  Id. ¶¶ 64-65.  He was told that NBLA's membership dues were not refundable.  Id. ¶ 66.  On January 8, 2013, Mock told Knisely about the deductions and NBLA's refusal to refund them.  Id. ¶ 67. Knisely alleges that he must reimburse Mock for these deductions.  Id. ¶ 183.  Later on January 8, Knisely called NBLA and spoke with Tavorice Smith, who identified himself as an NBLA employee but actually worked for Allied Health Benefits and CorpSavers.  Id. ¶ 68.  Knisely demanded that NBLA refund Mock or pay his medical bills.  Id. ¶ 69.  Smith stated that NBLA's premiums were not refundable and connected him with an AMLI representative, who Premiere Administrative Solutions employed.  Id. ¶ 70.  The representative denied Knisely's claim as untimely.  Id. ¶ 71.  Knisely responded that he could not have reported his claim earlier because he did not know that the AMLI policy was active when he was hospitalized.  Id. ¶ 72.

In May 2013, Knisely's counsel contacted NBLA to discuss Knisely's membership and claim for benefits.  Id. ¶ 80.  On May 10, 2014, John Oxendine, Esq. called Knisely's counsel on NBLA's behalf and stated that NBLA had no record of Knisely making a claim with AMLI.  Id. ¶ 81.  Oxendine confirmed this in writing on May 14, 2013.  Id. ¶ 82.

On May 23, 2014, Knisely's counsel contacted AMLI/Premiere Administrative Solutions to discuss Knisely's claim and learned that a HIPAA authorization first needed to be submitted.  Id. ¶ 85.  Knisely's counsel provided the HIPAA authorization and Knisely's medical bills on June 18, 2013 and requested reimbursement.  Id. ¶ 86.  By letter dated July 18, 2013, AMLI denied Knisely's claim as untimely, canceled his coverage and

asserted it was refunding Knisely $1,928.60 (less than the more than $8,000 deducted from Mock's account).  Id. ¶¶ 87, 89.  AMLI never issued the refund.  Id. ¶ 91.

The complaint further alleges that Timothy Siewert, G.Daniel Stiewart, III, Michael Siewart, Angus Morrison and George Spalding ran NBLA's operations as part of an insurance scam.  Id. ¶ 96.  It asserts that, around 2006, these individuals decided to use their closely held companies, NBLA, CorpSavers and Allied Health Benefits, to sell medical discount cards to consumers who were misled to believe the cards represented comprehensive health insurance.  Id. ¶¶ 97-127.  In this scheme, NBLA operated as a non-profit organization with Allied Health Benefits running its daily operations.  Id. ¶¶ 103, 105. NBLA received the membership fees and disbursed the profits to Allied Health Benefits  so that NBLA appeared to be a legitimate non-profit organization.  Id. ¶¶ 105, 108. Meanwhile, in 2007, CorpSavers, Allied Health Benefits' parent company, entered into an agreement with Jess Jordan where Jordan's company,  National Health Care Advisors, Inc., would market NBLA. Id. ¶ 112.  Jess and Landon Jordan owned and operated the call center where Sheila Sanchez and James Benjamin Lord worked, Health Lead Systems, Inc.  Id. ¶¶ 116.  AMLI became involved in the alleged insurance scam by underwriting NBLA in 2010.  Id. ¶ 120.

With all of this in place, the call centers sold NBLA memberships and misrepresented the insurance coverage offered by the AMLI policy.  Id. ¶ 121.  The defendants required call center employees to obtain consumers' credit card or bank account information to make automatic withdrawals and made it difficult to cancel NBLA memberships by requiring written cancellations on a form with misleading information.  Id. ¶ 123.  Due to these operations, by 2011, NBLA's membership exceeded 50,000

individuals and CorpSavers' sales increased from below $1,000,000 to over $20,000,000. Id. ¶¶ 117-18.

### 1. Bad Faith

NBLA argues that Knisely has acted in bad faith by unduly delaying in moving to amend his complaint and doing so to force NBLA to settle or punish it for not settling. NBLA avers that Knisely could have filed this motion months ago because he attached some of the information that he seeks to add to his complaint to his initial complaint. NBLA reinforces this argument with two items of correspondence from Knisely's counsel. The first document is a June 30, 2014 letter where Knisely states he will be moving to amend his complaint to add new defendants. The second document is a July 25, 2014 email where Knisely's counsel asserts that she is preparing an amended complaint to add the proposed new defendants and states:

> Because of the pending Motion to Dismiss, we will take great pains to articulate the connections between the parties and what we believe to have occurred in our motion to amend and amended complaint. As you know, our filings will be publicly available on the cm/ecf system for other litigants and potential litigants to see/use. I hope to finish the amended complaint/motion upon receipt of NBLA's financial statements and file by August 8.

> In the meantime, I forwarded a demand on June 30, 2014, and I would like to know if there is any interest in trying to resolve this case now. If so, please advise.

Knisely responds that NBLA precipitated any delay in moving to amend because he needed to compel production of financial statements concerning NBLA's ties to other entities for the amendment. He further avers that his settlement efforts do not evidence bad faith because he simply sought to avoid increased litigation costs and incentivize NBLA to settle to avoid public disclosure of information about the alleged insurance scam.

Here, the fact that Knisely moved to amend his complaint well before the amended pleadings deadline demonstrates that he has acted in good faith. The manner in which Knisely's counsel relied on potential amendments to the complaint in his settlement efforts, however, may have been an unethical negotiation tactic. See ABA Section of Litigation, Ethical Guidelines for Settlement Negotiations 4.3.2 (2002) ("A lawyer may not attempt to obtain a settlement by extortionate means, such as by making extortionate or otherwise unlawful threats."). The Court, however, will not hold counsel's actions against the client. Thus, that tactic does not give rise to bad faith.

The case that NBLA relies on for its bad faith argument, GSS Properties, Inc. v. Kendale Shopping Center Inc., 119 F.R.D. 379 (M.D.N.C. 1988), does not call for a different conclusion. In GSS Properties, the district court deemed a plaintiff's three-month delay in moving to amend his complaint blatant, explaining that the plaintiff knew of the facts underlying the amendment before filing suit "yet did not make the proposed amendments part of the original complaint and, in fact, went through an initial pretrial conference and scheduling order . . . without disclosing to the Court that amending the complaint was a possibility." Id. at 381. Then, the court found "bad faith in plaintiff's withholding facts clearly known to it prior to the filing of the complaint and then moving to amend the complaint where the evidence suggests that plaintiff had an ulterior purpose of either attempting to force defendant to settle or punishing defendant for failing to settle." Id. This case differs from GSS Properties in two key respects. Although Knisely may have thought that the alleged insurance scam involved more than NBLA and AMLI when he filed suit, Knisely avers that discovery has illuminated how other entities and individuals participated in it, which is a key component of his proposed amended complaint. It also

13

was no secret that Knisely may seek to amend his complaint earlier in this case. Knisely raised the issue when responding to NBLA's motion to dismiss and AMLI's motion for judgment on the pleadings. Accordingly, bad faith is not implicated.

### 2.    Prejudice

Next, NBLA asserts the amendment will prejudice it by increasing its expenses and prolonging uncertainty. Knisely is not raising new claims against NBLA that would require additional analysis. Rather, he is modifying his theory of the case in light of what discovery has revealed about how the alleged insurance scam operated. Given the purported close relationship between NBLA and the proposed new defendants, NBLA likely has been aware of those allegations for quite some time, which further shows the amendment will not require NBLA to assess new facts. Even if some of the allegations are new to NBLA, NBLA has adequate time to defend against them because trial begins next year. Accordingly, prejudice is not a basis for denying leave to amend.

### 3.    Futility

NBLA argues that the amendment is futile because it would not survive a motion to dismiss for lack of personal jurisdiction over NBLA or a motion to dismiss for failure to state a claim upon which relief can be granted. The Court will address these contentions in turn.[2]

### a.    Personal Jurisdiction

To exercise personal jurisdiction over a non-resident defendant, "(1) a statute must authorize service of process on the non-resident defendant, and (2) the service of process must comport with the Due Process Clause." In re Celotex Corp., 124 F.3d at 627.

---

[2] Because NBLA also makes these arguments in its motion to dismiss, the Court addresses them in light of the proposed amended complaint and the briefing regarding the motion to dismiss.

Because West Virginia's long-arm statute "is coextensive with the full reach of due process," the Court need not conduct "the normal two-step formula." Id. at 627-28 (citations omitted). Instead, "the statutory inquiry necessarily merges with the Constitutional inquiry." Id. at 628. Thus, the Court considers only whether personal jurisdiction "is consistent with the Due Process Clause." Id.

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). There are two types of personal jurisdiction, specific and general jurisdiction. Id.

If a defendant's contacts with the forum state provide the basis for the suit, "those contacts may establish 'specific jurisdiction.'" Id. The Fourth Circuit has stated that courts determine whether there is specific jurisdiction by assessing three factors: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Consulting Eng'rs Corp., 561 F.3d at 278 (citation and quotation marks omitted).

"The first prong articulates the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of conducting business under the laws of the forum state." Id. Courts do not mechanically apply this prong. Id. Rather, in the business context, courts in the Fourth Circuit consider a non-exhaustive list of eight factors to determine whether purposeful availment occurred:

(1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;" (7) "the nature, quality and extent of the parties' communications about the business being transacted;" and (8) "whether the performance of contractual duties was to occur within the forum."

Universal Leather, LLC, 773 F.3d at 560 (quoting Consulting Eng'rs Corp., 561 F.3d at 278).

The Supreme Court elaborated on the purposeful availment requirement in Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985). In that case, the Court stated that "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Id. at 474 (quotation marks and citation omitted). The Court elaborated that purposeful availment occurs when a defendant "deliberately has engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum." Id. at 475-76 (citations and internal quotation marks omitted). The Court also noted, however, that "even a single act can support jurisdiction" if "it creates a 'substantial connection' with the forum." Id. at 476 n.18.

Finally, in the context of a contractual relationship, like the one at issue here, the Burger King Court stated that "an individual's contract with an out-of-state party *alone*" does not establish minimum contacts. Id. at 478. Rather, the Court "emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which

16

themselves are the real object of the business transaction." Id. at 479 (citation and quotation marks omitted). The Court then stated that courts instead should evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether there are minimum contacts. Id.

To satisfy the second prong, Knisely must show that NBLA's contacts with West Virginia "form the basis of the suit." Consulting Eng'rs Corp., 561 F.3d at 578-79. The final prong requires that exercising personal jurisdiction would be constitutionally reasonable. Id. at 279. This prong allows "a defendant who purposefully has directed his activities at forum residents . . . to defeat jurisdiction" if he "present[s] a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477. A variety of factors are pertinent to this inquiry, including:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

Consulting Eng'rs Corp., 561 F.3d at 279.

### i.     Purposeful Availment

NBLA contests only the purposeful availment prong of the specific jurisdiction test. Knisely argues that NBLA purposely availed itself of the privilege of doing business in West Virginia by advertising in West Virginia, calling him to solicit his business, selling him the NBLA membership and failing to provide him contracted for services in West Virginia. NBLA counters that the advertising allegations are too vague to support specific jurisdiction and the mere fact that it sold a membership to a West Virginia resident does not subject

17

it to personal jurisdiction.

Having considered the relevant factors and the proposed amended complaint, the Court finds that Knisely sufficiently alleges that NBLA purposefully availed itself of the privilege of conducting activities in West Virginia through its marketing plan and contractual relationship with Knisely.

First, the proposed amended complaint alleges that National Health Care Advisors marketed NBLA memberships based on authority granted by NBLA through CorpSavers. This marketing plan included the placement of television advertisements in West Virginia and the use of call center agents to sell NBLA memberships to West Virginia residents. These allegations, backed by West Virginia resident Knisely's solicitation in West Virginia by NBLA's advertisement and interaction from his home in West Virginia with the call center employees advocating on NBLA's behalf, demonstrate that NBLA purposefully reached into West Virginia to solicit business. The Court recognizes that NBLA maintains that this factor counsels against personal jurisdiction because Knisely first called NBLA. Knisely, however, would not have called the toll-free number to contact NBLA but for NBLA's advertisement in West Virginia. Thus, it was NBLA's marketing efforts, not Knisely, that initiated contact with West Virginia residents and led Knisely to make that call. Moreover, the allegation that NBLA elected to return Knisely's phone call through the call center agents is an active step by NBLA to reach into West Virginia to initiate a business relationship. Thus, these allegations show NBLA reached into West Virginia to solicit the business of West Virginia residents.

The nature of NBLA and Knisely's contract also shows that NBLA would reasonably anticipate being haled into court in West Virginia because contractual duties were to be

18

performed there.  The mere fact that NBLA contracted with a West Virginia resident does not render personal jurisdiction proper.  See Burger King, 471 U.S. at 478.  According to Knisely, however, NBLA sold him a membership that it marketed as offering a comprehensive group health insurance policy with AMLI.  In a similar case that involved an insurance contract, McGee v. International Life Insurance Co., 355 U.S. 220 (1957), the Supreme Court held that a California court had personal jurisdiction over a Texas insurance company because the company had assumed the obligations of a life insurance policy issued to a California resident by an Arizona insurer, mailed a reinsurance certificate to the insured in California and accepted premiums from the California resident. 355 U.S. at 221-24.  Although NBLA is not the insurer in the alleged insurance scam, McGee translates to this case.  McGee focused on the location of the individual receiving and paying for a contract's benefits when those benefits were particularly personal to the individual because insurance was at issue.  Similarly, NBLA contracted to give benefits of a membership involving an insurance policy to a West Virginia resident and deducted dues for that membership from the bank account of another West Virginia resident.  Thus, it was foreseeable to NBLA that it could be sued in West Virginia concerning a membership that obligated NBLA to provide the personal benefits of a group health insurance policy to a West Virginia resident.

Having considered the relevant factors, NBLA reached into West Virginia to solicit the business of West Virginia residents and had a contract with Knisely where NBLA was obligated to offer the benefits of a membership to a West Virginia resident.   Either of these factors alone show that NBLA purposefully availed itself of the privilege of doing business in West Virginia.  Accordingly, Knisely has satisfied this prong.

### ii. Relationship of Claims to Activities in West Virginia

Considering the second prong of the analysis, Knisely's claims against NBLA arise from its forum-related activities. Knisely predicates his UTPA and fraud claims on statements NBLA made in the television advertisement and phone call to Knisely that led Knisely to purchase the membership and statements NBLA made concerning Knisely's membership. Thus, this prong is satisfied.

### iii. Constitutional Reasonableness

Finally, the Court assesses whether exercising personal jurisdiction is constitutionally reasonable. It is NBLA's burden to establish that other considerations make jurisdiction unreasonable, but NBLA has not made such an argument. Burger King, 471 U.S. at 477. Thus, given that West Virginia "generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors, id. at 473, Knisely has satisfied the third prong of the specific personal jurisdiction test.

Having found that the proposed amended complaint pleads a *prima facie* case of specific personal jurisdiction over NBLA, the amendment is not futile on this basis.

### b. Failure to State a Claim

Next, NBLA argues that the RICO, UTPA, Plan Act, fraud and indemnification claims fail to state a claim upon which relief can be granted. The Court will address these claims as well as the proposed bad faith and breach of contract claim.

### i. RICO

The proposed amended complaint asserts a RICO claim against AMLI, Allied Health Benefits, CorpSavers Healthcare, Premiere Administrative Solutions, Timothy Siewart, G.

Daniel Siewart, III, Michael Siewart, Angus Morrison, George Spalding, Landon Jordan and Jess Jordan.

NBLA argues that amending this claim is futile because the Court's prior dismissal of this claim operated with prejudice and, even if it did not, the proposed amended complaint does not remedy the deficiencies of this claim that the Court noted. Knisely contends that NBLA lacks standing to challenge this portion of the proposed amendment because he is not raising a RICO claim against NBLA.

Here, first, the Court's granting of AMLI's motion for judgment on the pleadings, which was subject to review according to the standard of review applicable to a Rule 12(b)(6) motion to dismiss, operated as a dismissal with prejudice. See, e.g., McLean v. United States, 566 F.3d 391, 396 (4th Cir. 2009) ("Courts have held that, unless otherwise specified, a dismissal for failure to state a claim under Rule 12(b)(6) is presumed to be both a judgment on the merits and to be rendered with prejudice."); Carter v. Norfolk Cmty. Hosp. Ass'n, Inc., 761 F.2d 970, 974 (4th Cir. 1985) ("A district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice."). The amended complaint, however, asserts new RICO claims against different entities and individuals. Because Knisely contends that these claims address the deficiencies the Court noted when dismissing the RICO claims brought against AMLI and NBLA, it does not appear at this stage that these claims would not survive a motion to dismiss. Indeed, the proposed new defendants, not NBLA, are in a position to move for their dismissal.[3] See Silverstein v. Percudani, 422 F. Supp. 2d 468, 473 (M.D. Pa. 2006),

---

[3] This determination does not preclude the new defendants from moving to dismiss the RICO claims.

aff'd, 207 F. App'x 238 (3d Cir. 2006) (recognizing that a court can, but need not, *sua sponte* dismiss a claim against a non-moving defendant); see also Johnson v. Baskerville, 568 F. Supp. 853, 856 (E.D. Va. 1983).

Accordingly, amendment of the RICO claim against AMLI is futile, but the amendment is not futile as to the RICO claims asserted against Allied Health Benefits, CorpSavers Healthcare, Premiere Administrative Solutions, Timothy Siewart, G. Daniel Siewart, III, Michael Siewart, Angus Morrison, George Spalding, Landon Jordan and Jess Jordan. Thus, Knisely may amend his complaint to assert the RICO claims only against the new defendants.

### ii.    UTPA

The UTPA prohibits a person from engaging "in any trade practice which is defined in this article as . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." W. Va. Code. § 33-11-3. West Virginia recognizes an implied private cause of action for violations of the UTPA brought pursuant to § 33-11-4(9). Syl. Pt. 2, Jenkins v. J.C. Penney Cas. Ins. Co., 280 S.E.2d 252, 253 (W. Va. 1981), overruled on other grounds, State ex rel. State Farm Fire & Cas. Co. v. Madden, 451 S.E.2d 721 (W. Va. 1994). Previously, the Court denied AMLI's motion for judgment on the pleadings on Knisely's UTPA claims based on § 33-11-4(9). Thus, to the extent that Knisely seeks to maintain those claims and add Premiere Administrative Solutions to them, amendment of these claims as to AMLI is not futile and does not appear to be futile as to Premiere Administrative Solutions at this stage.[4]

---

[4] This determination does not preclude Premiere Administrative Solutions from moving to dismiss the UTPA claims.

The proposed amended complaint alleges that NBLA violated West Virginia Code § 33-11-4(9)(a) of the UTPA "by misrepresenting pertinent facts and insurance policy provisions relating to [Knisely's] insurance coverage" when handling Knisely's claim for benefits under the AMLI policy. Proposed Am. Compl. ¶¶ 145-46. NBLA contends that the UTPA does not apply to it because it is not in the business of insurance. Knisely responds that NBLA is in the business of insurance because NBLA acted as an agent of AMLI by selling Knisely the policy and making misrepresentations about the AMLI policy through its counsel.

Section 33-11-4(9)(a) of the UTPA concerns the handling of a claim made under an insurance policy. It prohibits a person from "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue" "with such frequency as to indicate a general business practice." W. Va. Code § 33-11-4(9)(a).

The UTPA, however, applies "only to those persons or entities and their agents who are engaged in the business of insurance." Syl. Pt. 4, Rose ex rel. Rose v. St. Paul Fire & Marine Ins. Co., 599 S.E.2d 673, 674 (W. Va. 2004) (citation and quotation marks omitted). The statute defines "person" as including "any individual, company, insurer, association, organization, society, reciprocal, business trust, corporation, or any other legal entity, including agents and brokers." W. Va. Code § 33-11-2(a).

Here, the proposed amended complaint alleges that AMLI was "[t]he insurer in the insurance scam" that sold its policies through associations and marketers and that Knisely purchased an AMLI health insurance policy through his NBLA membership. Proposed Am. Compl. ¶¶ 1, 3, 5-6. Even viewing these allegations in the light most favorable to Knisely, NBLA is not engaged in the business of insurance. Rather, NBLA is an association that

23

offers AMLI's insurance policy to its members.  <u>See</u> <u>id.</u> Ex. J.  Thus, for NBLA to be liable for violating the UTPA, the proposed amended complaint must plausibly plead that NBLA was an agent of AMLI involved in violating § 33-11-4(9)(a).  Knisely has not done so.

First, the fact that NBLA sold Knisely a membership that offered the AMLI policy does not make it AMLI's agent for purposes of handling Knisely's claim.  In a similar case, <u>Ayers v. Continental Casualty Co.</u>, Civil Action No. 5:05CV95, 2006 WL 278540, at *6 (N.D.W. Va. Feb. 2, 2006), United States District Judge Frederick P. Stamp, Jr. found that an independent insurance agency that had sold the insurance policy underlying the plaintiff's UTPA claims but was not involved in adjustment, settlement or control of claims made under that policy was not an agent of the insurer subject to UTPA liability.  Thus, NBLA must have done more than sell the policy to have been AMLI's agent concerning the claim Knisely made under the policy.

However, there are not sufficient allegations to make out a plausible claim that NBLA misrepresented facts or insurance policy provisions in handling Knisely's claim to render it AMLI's agent for the UTPA violations.  AMLI, not NBLA, settled Knisely's claim.  At most, NBLA connected Knisely with the AMLI/Premiere Administrative Solutions representative who handled his claim.  Although NBLA may have misrepresented that Knisely did not submit a claim, that misrepresentation does not make it AMLI's agent for the alleged UTPA violations because the misrepresentation did not concern the "pertinent facts or insurance policy provisions relating to coverages at issue."  Without any allegations that NBLA communicated with Knisely about his coverage under the policy, there is no plausible claim that NBLA "misrepresent[ed] pertinent facts or insurance policy provisions" concerning Knisely's claim.  <u>See</u> <u>id.</u> at *6 (holding independent insurance agency not liable under

UTPA because, without evidence of communication between agency and plaintiffs, agency "could not have directly provided the plaintiffs with 'false, deceptive and misleading' information relating to the policy"). Accordingly, amending the UTPA claim against NBLA is futile. Knisely may amend his complaint only to maintain the UTPA claim against AMLI and Premiere Administrative Solutions.

### iii.    The Plan Act

The Plan Act claim alleges that NBLA, Allied Health Benefits and CorpSavers violated the Plan Act by doing business in West Virginia as a discount medical plan organization without obtaining a license, W. Va. Code § 33-15E-4, and not maintaining a surety bond as required by West Virginia Code § 33-15E-6. NBLA argues that there is no private cause of action under the Plan Act. Knisely asks the Court to recognize one for the first time. The Court declines to do so.

When the "violation of a statute is the centerpiece of a theory of liability, the question arises whether the statute creates an implied private cause of action." Arbaugh v. Bd. of Educ., Cnty. of Pendleton, 591 S.E.2d 235, 239 (W. Va. 2003). To bring a private cause of action based on a violation of a statute, a plaintiff must satisfy a four-part test promulgated in Hurley v. Allied Chemical Corp., 262 S.E.2d 757 (W. Va. 1980):

> (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.

Arbaugh, 591 S.E.2d at 239 (quoting Syl. Pt. 1, Hurley, 262 S.E.2d at 758). "Although all prongs of the test have weight and none, standing alone, is determinative, . . . legislative

intent is the polar star in determining the existence of a private cause of action." <u>Fucillo v.</u>

<u>Kerner ex rel. J.B.</u>, 744 S.E.2d 305, 310 (W. Va. 2013).

Considering the first prong of the <u>Hurley</u> analysis, the Plan Act's stated purpose is:

> [T]o establish standards for discount medical plan organizations and discount prescription drug plan organizations in order to better protect consumers from unfair or deceptive marketing, sales and enrollment practices and to facilitate consumer understanding of the role and function of the organizations in providing access to medical or ancillary services.

W. Va. Code § 33-15E-2. This provision reveals that the West Virginia legislature enacted the Plan Act to protect consumers. Because Knisely is a consumer, he is a member of the class for whose benefit the legislature enacted the Plan Act.

As for the second prong of the <u>Hurley</u> test, the text of the Plan Act shows that the legislature only intended for criminal and administrative penalties to flow from it.

The Plan Act provides for criminal penalties in two situations: first, when a person "willfully operates as or aids and abets another operating as a discount medical plan organization" without a license to do business in West Virginia in violation of West Virginia Code § 33-15E-4(a) and, second, when a person collects membership fees for a discount medical plan or discount prescription drug plan and willfully fails to provide the plan's benefits. W. Va. Code § 33-E-15(a)-(b). West Virginia Code § 33-15E-14(c) gives the commissioner of insurance various administrative powers to enforce the Plan Act. Those powers include the ability to revoke a discount medical plan organization's license, impose civil penalties, issue cease and desist orders and suspend an organization's authority to enroll new members. W. Va. Code § 33-15E-14(c). Section 33-15E-14 also authorizes the commissioner to seek injunctive relief when "a discount medical plan is being operated by a person or entity that is not licensed pursuant to this article or any person has engaged

or is engaging in any activity prohibited by this article or any rule adopted pursuant to this article." W. Va. Code § 33-15E-14(d).

Knisely has argued that the availability of administrative penalties does not preclude a private cause of action, relying exclusively on Jenkins v. J. C. Penney Casualty Insurance Co., 280 S.E.2d 252 (W. Va. 1981), where the Supreme Court of Appeals of West Virginia found there was a private cause of action for violations of the UTPA despite the presence of administrative penalties in the statute. Jenkins, however, based this outcome on language in the UTPA that indicated that administrative remedies were not an exhaustive remedy: "that the commissioner's administrative orders 'shall (not) in any manner relieve or absolve any person affected by such order . . . from any other liability.'" Id. at 606. There is no comparable language in the Plan Act. The Plan Act outlines criminal and administrative penalties without mentioning that other liability may arise from violating it. Accordingly, because the Plan Act provides only for criminal penalties and administrative enforcement actions, there is no indication that the legislature intended to create a private cause of action for violations of the Plan Act.

With respect to the third prong of the Hurley test, the Plan Act has two express goals: first, "to establish standards for discount medical plan organizations and discount prescription drug plan organizations in order to better protect consumers from unfair or deceptive marketing, sales and enrollment practices" and, second, "to facilitate consumer understanding of the role and function of the organizations in providing access to medical or ancillary services." W. Va. Code § 33-15E-2. A private cause of action would not help establish uniform standards and increase consumer understanding in this area. Private lawsuits could instead lead to judicial decisions inconsistent with how the commissioner of

insurance fulfills his duties under the Plan Act and conflicting interpretations of the Plan Act that would undermine consumer understanding. Moreover, it is unclear how the alleged Plan Act violations–failure to obtain a license and post a surety bond–would help establish standards for discount medical plan organizations and facilitate consumer understanding. Accordingly, a private cause of action would not be consistent with the underlying purpose of the Plan Act.

Finally, the fourth prong of the <u>Hurley</u> test is inapplicable because this matter does not intrude into an area delegated exclusively to the federal government. Considering all of the <u>Hurley</u> factors, and particularly the critical legislative intent factor, the Court holds that a private cause of action does not exist under the Plan Act. Accordingly, amendment of this claim is futile because it fails to state a claim upon which relief can be granted.

### iv. Fraud

Knisely raises a fraud claim against NBLA, AMLI, Allied Health Benefits, CorpSavers and Premiere Administrative Solutions based on three categories of misrepresentations: (1) statements that led Knisely to purchase the NBLA membership and AMLI policy, Proposed Am. Compl. ¶¶ 172-74; (2) statements concerning Knisely's attempt to cancel the NBLA membership and AMLI policy, <u>id.</u> ¶ 175; and (3) statements concerning the claim for benefits under the AMLI policy. <u>Id.</u> ¶ 176.

Under West Virginia law, "[t]he essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." Syl. Pt. 1, <u>Lengyel v. Lint</u>, 280 S.E.2d 66, 67 (W. Va. 1981) (citation and quotation marks omitted).

NBLA argues that amending this claim is futile because: (1) the statute of limitations bars it; (2) Knisely does not allege actual reliance; (3) Knisely does not plead the alleged misrepresentations with particularity; and (4) Knisely does not allege that any misrepresentation proximately caused him damage. The Court will address these arguments as to each category of alleged misrepresentations.

### a) Statute of Limitations

The Court applies the West Virginia statute of limitations and West Virginia law construing it. Wade v. Danek Med., Inc., 182 F.3d 281, 289 (4th Cir. 1999) (holding that district courts should apply the state statute of limitations and any rule constituting "an integral part" of it). West Virginia courts conduct a five-step analysis set forth in Dunn v. Rockwell, 689 S.E.2d 255 (W. Va. 2009) to determine whether the statute of limitations bars a cause of action.

First, the Court must "identify the applicable statute of limitation." Id. at 265. Here, a fraud claim has a two-year statute of limitations. Brown v. Cmty. Moving & Storage, Inc., 455 S.E.2d 545, 547 n.3 (W. Va. 1995).

Second, the Court "should identify when the requisite elements of the cause of action occurred." Dunn, 689 S.E.2d at 265. Third, the Court must determine whether the discovery rule should apply using the criteria set forth in Syllabus Point 4 of Gaither v. City Hosp., Inc., 487 S.E.2d 901 (W. Va. 1997). Id. Syllabus Point 4 of Gaither provides:

> In tort actions . . . under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

"[W]hether a plaintiff 'knows of' or 'discovered' a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test assesses whether a reasonable person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action."  Syl. Pt. 4, Dunn, 689 S.E.2d at 258.  Further, "[w]here a plaintiff knows of his injury, and the facts surrounding that injury place him on notice of the possible breach of a duty of care, that plaintiff has an affirmative duty to further and fully investigate the facts surrounding that potential breach."  McCoy v. Miller, 578 S.E.2d 355, 359 (W. Va. 2003).

Fourth, if the court finds that "the plaintiff is not entitled to the benefit of the discovery rule," it "determine[s] whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action."  Dunn, 689 S.E.2d at 265. Fifth, the court determines whether "some other tolling doctrine" arrests the statute of limitation period.  Id.

### 1)      Statements Leading to the Purchase

The elements of the fraud claim concerning statements that led Knisely to purchase the policy occurred on March 25, 2011.  See id.  On that date, the defendants made false statements to Knisely about the NBLA membership and AMLI policy through an advertisement and the call center representatives, Knisely relied on that information by purchasing the policy, and Knisely was damaged by authorizing the payment of fees from Mock's account that Knisely must repay to Mock.  Now applying the discovery rule, Knisely knew or should have known of his fraud claim concerning these alleged misrepresentations by April 4, 2014 because he called NBLA to cancel his membership on that date after

learning that the membership did not offer the benefits promised. Further, neither fraudulent concealment nor another tolling doctrine apply because Knisely does not argue that they do.

In light of the <u>Dunn</u> analysis, the two-year statute of limitations bars Knisely's fraud claim concerning statements that led him to purchase the membership and policy. <u>See</u> Syl. Pt. 1, <u>Wilt</u>, 506 S.E.2d at 608. Giving Knisely the benefit of the discovery rule, the statute of limitations began to run on April 4, 2011. He filed this case more than two years later on December 12, 2013. Accordingly, amendment of this portion of the fraud claim is futile.

### 2) Statements Concerning Cancellation

The Court now assesses the fraud claim arising from Holmes' statement on April 18, 2011 that he had cancelled Knisely's membership and policy. This claim's elements occurred on or around that date because, instead of canceling the policy as stated, NBLA continued to deduct dues from Mock's account, which has damaged Knisely in that he must reimburse Mock for those dues. <u>See</u> <u>Dunn</u>, 689 S.E.2d at 265. Next, under the discovery rule, Knisely knew or should have known of this claim by January 8, 2013. On that date, Mock informed Knisely that NBLA was still deducting funds from his account. Before having that knowledge, a reasonable person in Knisely's position would not have known that NBLA failed to cancel the membership and policy because Knisely had no information indicating that the cancellation did not occur. Indeed, because NBLA deducted the funds from a third party's bank account, Knisely could not reasonably discover the deductions earlier. Thus, because Knisely filed suit fewer than two years after January 8, 2013, his fraud claim based on the cancellation misrepresentations is timely.

### 3) Representations Concerning Claim

Finally, the elements of the fraud claim concerning Knisely's claim for benefits occurred as early as January 8, 2013 because Knisely reported his claim to AMLI then. Because that date is fewer than two years before Knisely filed suit, this fraud claim is timely. Accordingly, the statute of limitations only bars Knisely's fraud claim based on misrepresentations that led him to purchase the NBLA membership.

### b) Actual Reliance

NBLA also argues that Knisely does not sufficiently allege that he relied on a material, false action of the defendants. See Syl. Pt. 1, Lengyel, 280 S.E.2d at 67.

Here, considering the statements made concerning cancellation, Knisely has plausibly alleged actual reliance. His proposed amended complaint alleges that, based on Holmes' representation that he had canceled the NBLA membership, Knisely believed that he would no longer need to pay for the membership and policy. See Proposed Am. Compl. ¶¶ 58-60. Knisely also alleges that he did not timely submit a claim for benefits with AMLI because, when he was hospitalized, he thought NBLA had cancelled his membership. Id. ¶¶ 60-63. Knisely has not, however, alleged that he took any action in reliance on statements made concerning his claim for benefits. Accordingly, amending the fraud claim concerning statements made during the handling of Knisely's claim for benefits is futile because Knisely does not allege facts showing actual reliance.

### c) Particularity

NBLA also contends that Knisely has not pleaded the statements concerning the cancellation with the particularly required by Federal Rule of Civil Procedure 9(b).

Rule 9(b) requires that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud." These circumstances "are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) (citation and quotation marks omitted).

Here, the proposed amended complaint alleges that NBLA, CorpSavers and Allied Health Benefits "made false statements concerning the cancellation of [Knisely's] enrollment in the NBLA plan." There are specific factual allegations about those statements and the context in which they occurred: (1) that, on April 18, 2011, Knisely called NBLA "and spoke with an [Allied Health Benefits]/CorpSavers employee, Brandon Holmes, who advised that Mr. Knisely must sign and return a cancellation form to cancel his membership"; (2) that Knisely objected to filling out the form and "demanded that his membership be cancelled immediately"; (3) that "Holmes advised that he cancelled Mr. Knisely's membership, effective immediately"; and, (4) "[n]otwithstanding, NBLA continued to make unauthorized deductions from Don Mock's checking account on the average of $385.83 a month through to January of 2013." Proposed Am. Compl. ¶¶ 56-59. Knisely further alleges that "he did not provide the hospital with an insurance card as he had been led to believe that the membership had been cancelled." Id. ¶ 63. These allegations sufficiently allege the time, place and contents of the false representation, the individual who made the representation (Brandon Holmes), and what NBLA obtained through the representations (funds from Mock's account that Knisely alleges he must repay). Further, CorpSavers and Allied Health Benefits are implicated in these allegations because the

complaint alleges that CorpSavers and Allied Health Benefits ran NBLA's operations and collected its profits. See id. ¶¶ 96-118. Accordingly, the proposed amended complaint pleads the cancellation misrepresentations with particularity.

### d) Proximate Cause and Damage

Finally, NBLA argues that Knisely does not allege that the fraud proximately caused him any damage.

Here, the proposed amended complaint alleges that, due to the cancellation misrepresentation, Knisely must repay Mock the fees that NBLA deducted from his bank account. As an alternative theory of recovery, it asserts that, because Knisely believed his membership was cancelled, he submitted his claim for coverage to AMLI too late to be reimbursed. These allegations plausibly show that Knisely was damaged because he relied on Holmes' statement that the NBLA membership was cancelled.

In sum, only the proposed fraud claim based on the cancellation misrepresentation, which is alleged in paragraph 175 of the proposed amended complaint, would survive a Rule 12(b)(6) motion to dismiss. Thus, the Court finds that amending that fraud claim is not futile and grants Knisely leave to amend it. However, the Court denies leave to amend the fraud claim based on the misrepresentations alleged in paragraphs 172 through 174 and 176 and 177 because doing so is futile.

### v. Indemnification

Next, NBLA argues adding the implied indemnification claim is futile.[5] Under West Virginia law, the elements of an implied indemnity claim are:

---

[5] Implied indemnification applies because Knisely does not base this claim on an express agreement.

(1) an injury was sustained by a third party; (2) for which a putative indemnitee has become subject to liability because of a positive duty created by statute or common law, but whose independent actions did not contribute to the injury; and (3) for which a putative indemnitor should bear fault for causing because of the relationship the indemnitor and indemnitee share.

Syl. Pt. 4, Harvest Capital v. W. Va. Dep't of Energy, 560 S.E.2d 509, 511 (W. Va. 2002).

Here, NBLA only contests the second element of this claim, arguing that Knisely has not pleaded that it is liable to Mock for the dues NBLA deducted from Mock's bank account. Knisely does, however, allege that he must reimburse Mock for those dues. Proposed Am. Compl. ¶¶ 180, 183. Accordingly, adding this claim is not futile.

### vi. Bad Faith and Breach of Contract

Finally, the Court notes that the proposed amended complaint reasserts the bad faith and breach of contract against AMLI that the Court dismissed. Because that dismissal operated with prejudice, amending this claim is futile. See, e.g., McLean, 566 F.3d at 396. Accordingly, the Court denies Knisely leave to amend this claim.

In sum, the Court grants Knisely leave to amend his complaint to raise the following claims: (1) Count I - RICO against the new defendants; (2) Count II - UTPA against AMLI and Premiere Administrative Solutions; (3) Count V - fraud based on cancellation false statements alleged in paragraph 175 against NBLA, AMLI, Allied Health Benefits, CorpSavers and Premiere Administrative Solutions; and (4) Count VI - indemnification. The other claims asserted in the proposed amended complaint are not a part of this case per the foregoing rulings.

### B. Motion to Dismiss

Finally, the Court turns to NBLA's motion to dismiss. Having found that Knisely's

amended complaint establishes a *prima facie* case of personal jurisdiction over NBLA, the Court denies NBLA's motion to dismiss for lack of personal jurisdiction without prejudice. Because the motion to dismiss for failure to state a claim upon which relief can be granted does not concern Knisely's amended complaint, the Court denies this motion as moot.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES AS MOOT** the Plaintiff's Motion for Leave to File an Amended Complaint.

The Court **GRANTS IN PART** the Plaintiff's Motion for Leave to File Revised Amended Complaint. Specifically, the Court **GRANTS** the Plaintiff leave to amend to raise the following claims:

1. Count I - RICO against Allied Health Benefits, Inc., CorpSavers Healthcare, Inc., Premiere Administrative Solutions, Inc., Timothy Siewart, G. Daniel Siewart, III, Michael Siewart, Angus Morrison, George Spalding, Landon Jordan and Jess Jordan;

2. Count II - UTPA against American Medical and Life Insurance Company and Premiere Administrative Solutions, Inc.;

3. Count V - fraud based on cancellation false statements alleged in paragraph 175; and

4. Count VI - indemnification.

The Court **DENIES** the Plaintiff leave to amend the following claims:

1. Count I - RICO against American Medical and Life Insurance Company;

2. Count II - UTPA against National Better Living Association, Inc.;

3. Count III - Violations of the Discount Medical Plan Organizations and Discount Prescription Drug Plan Organizations Act;

4. Count IV - bad faith and breach of contract; and

5. Count V - fraud based on false statements alleged in paragraphs 172 through 174 and paragraphs 176 through 177 of the Amended Complaint.

The Court **ORDERS** the Plaintiff to file a revised version of the amended complaint that is attached to his Motion for Leave to File Revised Amended Complaint that is consistent with this Order by <u>**May 7, 2015**</u>.

The Court **DENIES WITHOUT PREJUDICE** NBLA's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2).

The Court **DENIES AS MOOT** NBLA's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The Clerk is directed to transmit copies of this Order to counsel of record herein.

**DATED:** April 23, 2015

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE