## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG DIVISION

**DAVID KNISLEY,**

      **Plaintiff,**

**v.**                                          **Civil Action No. 3:14-CV-15**
                                                  **Judge Groh**

**NATIONAL BETTER LIVING
ASSOCIATION, INC., ALLIED
HEALTH BENEFITS, INC.,
CORPSAVERS HEALTHCARE, INC.,
AMERICAN MEDICAL AND LIFE
INSURANCE COMPANY, PREMIERE
ADMINISTRATIVE SOLUTIONS, INC.
G. DANIEL SIEWERT, III, TIMOTHY
SIEWERT, MICHAEL C. SIEWERT,
ANGUS MORRISON, GEORGE SPALDING,
LANDON JORDAN AND JESS JORDAN,**

      **Defendants.**

### FIRST AMENDED COMPLAINT

Comes now the Plaintiff David Knisley, by and through counsel, Laura C. Davis and Skinner Law Firm, as his First Amended Complaint against National Better Living Association, Inc., Allied Health Benefits, Inc., CorpSavers Healthcare, Inc., American Medical and Life Insurance Company, Premiere Administrative Solutions, Inc., Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, George Spalding, Landon Jordan, Jess Jordan, Plaintiff states as follows:

## NATURE OF THE CASE

1.    This case concerns a coordinated insurance scam orchestrated by CorpSavers HealthCare, Inc. ("CorpSavers"), Allied Health Benefits, Inc. ("AHB"), Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, George Spalding, Landon Jordan, and Jess Jordan, to solicit vulnerable and desperate consumers in order to sell them junk health insurance through Defendant National Better Living Association, Inc. ("NBLA"), based upon false statements, manipulation, and high pressure sales tactics.

2.    CorpSavers, AHB, Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, George Spalding, Landon Jordan, and Jess Jordan, sought to target consumers who were unable to procure other insurance for many reasons, including but not limited to pre-existing health conditions, such as in Mr. Knisley's case.

3.    The Defendants preyed upon the vulnerabilities of people who either had trouble qualifying for, or had trouble affording, traditional comprehensive health insurance by falsely representing that the NBLA membership was a low cost way to obtain full insurance coverage.

4.    Since the filing of the original Complaint, a recording of the sales call between Defendants' sales agent, James Benjamin Lord, and Mr. Knisley surfaced and it confirms that Defendants' agent intentionally misled Mr. Knisley into believing that his pre-existing health condition would be covered by the insurance plan.

5.    Based upon Defendants' agent's false statements and assurances, and with the permission from David Knisley's roommate, Don Mock, Mr. Knisley gave NBLA

and its alter egos, CorpSavers and AHB access to Don Mock's bank account, to initiate the NBLA membership.

6.      The insurer in the insurance scam, American Medical and Life Insurance Company (AMLI), was an active participant in the fraud, as it knew that if the associations and marketers through which it sold its policies were truthful about the limited scope of the coverage, no one would purchase the coverage.

7.      The allegations made by Mr. Knisley are echoed by many other victims nationwide who were misled into giving Defendant, direct access to their credit cards and/or checking account information through false promises of comprehensive coverage for pre-existing medical conditions and the like.

8.      The collective Defendants' pattern of fraudulent conduct resulted in hundreds of consumer complaints against AMLI, AHB, NBLA, and CorpSavers across the nation including civil and administrative actions in at least the following states: Alaska, Alabama, Arkansas, Florida, Georgia, Kentucky, Maine, Maryland, Michigan, Montana, New York, Utah, and Wisconsin.

9.      By way of example, in 2009, the Alaska Insurance Commissioner fined AMLI for unlawful practices and required AMLI to return all premiums to the consumers affected. (**Exhibit A**).

10.     In July 2009, the New York State Insurance Department sanctioned and fined Defendant AMLI for fraudulent sales practices, including promising non-existent coverage for pre-existing conditions and falsely implying that the limited medical benefits plans it offered were comprehensive.  New York indefinitely suspended

Defendant AMLI from writing limited medical benefit insurance in its home state. (**Exhibit B**)

11.　　On May 18, 2012, the Florida Office of Insurance Regulation entered a consent order fining AMLI $250,000 for its fraudulent practices. (**Exhibit C**)

12.　　In 2012, Maine's Bureau of Insurance implicated AMLI in fraudulent activities in an order revoking an affiliate of AMLI, Cinergy Health, Inc.'s license to sell insurance in the state of Maine. (**Exhibit D**)

13.　　In 2012, the Michigan Office of Financial Insurance Regulation suspended AMLI's license to sell insurance in the State of Michigan and ordered AMLI to compensate consumers. (**Exhibit E**)

14.　　In West Virginia, there have been myriad consumer complaints against AMLI and its marketers for deception, refusal to timely cancel, and for depriving residents of premiums and leaving them with medical debt.  (See, e.g. West Virginia Insurance Commissioner consumer complaints, collectively attached as **Exhibit F**, and filed *under seal*).

15.　　In 2012, the Montana Commissioner of Securities and Insurance, upon a lengthy investigation of NBLA and its affiliates, ordered NBLA to cancel all business in the state and barred NBLA from selling benefit plans in the state. (**Exhibit G**).  The Commissioner prepared a chart explaining how the insurance scam worked and it is illustrative of what happened in Mr. Knisley's claim.  (**Exhibit H**)

16.　　The Georgia Bureau of Insurance filed an administrative action against NBLA, AMLI, CorpSavers, AHB, and dozens of other affiliated people and entities, for

multiple violations of Georgia law (**Exhibit I**); NBLA is no longer permitted to operate in its home State of Georgia, and CorpSavers HealthCare, Inc., and AHB were fined $60,000.00.

17. Defendants routinely fraudulently misrepresented the extent and nature of the insurance benefits that they were offering consumers and then charged exorbitant fees for what amounted to worthless insurance coverage.

18. Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, George Spalding, Landon Jordan, and Jess Jordan used their closely-held business enterprises of NBLA, CorpSavers, AHB, National Healthcare Advisors, Inc. ("NHAI"), and the call center, Health Lead Systems, Inc. ("HLS"), to obtain access to consumers' bank accounts and credit cards through 1) the false promise of comprehensive medical coverage while providing worthless insurance; 2) misrepresentations that consumers had a 30-day "free look" period when the $110.00 "activation fee" was non-refundable; 3) making it difficult to cancel NBLA memberships so that Defendants could continue to deduct monthly dues/premiums from consumers' accounts; 4) requiring consumers to return a cancellation form intended to mislead and intimidate consumers; all in the pursuit of personally enriching the Defendants and their business interests.

## JURISDICTION AND VENUE

19. The Plaintiff re-alleges all previous allegations and incorporates them herein by reference.

20. Plaintiff David Knisley was at all times relevant to the matters set forth herein a resident of Harpers Ferry, Jefferson County, West Virginia.

21.     Defendant NBLA is a Georgia corporation who, at all relevant times to this First Amended Complaint was doing business in West Virginia although it was not authorized to do so.

22.     Defendant CorpSavers is a Georgia corporation who, at all relevant times to this First Amended Complaint was doing business in West Virginia, although it was not authorized to do so.

23.     Defendant AHB is a Georgia corporation who, at all relevant times to this First Amended Complaint was doing business in West Virginia, although it was not authorized to do so.

24.     Defendant Timothy Siewert was a former executive and/or director at NBLA but, at all times relevant to this First Amended Complaint, was an executive and/or director at NBLA's alter egos, CorpSavers and AHB, both of whom are located at 6470 E. Johns Crossing, Ste 170, Johns Creek, GA 30097; upon information and belief, Timothy Siewert resides in Georgia.

25.     Defendant G. Daniel Siewert, III is a former executive and/or director at NBLA and, at all times relevant to this First Amended Complaint, is an executive and/or director at CorpSavers and its alter ego AHB, both of whom are located at 6470 E. Johns Crossing, Ste 170, Johns Creek, GA 30097; upon information and belief, G. Daniel Siewert, III resides in Georgia.

26.     Defendant Michael Siewert is a former executive and/or director at NBLA and, at all times relevant to this First Amended Complaint, is an executive and/or director at CorpSavers and its alter ego, AHB, both of whom are located at 6470 E. Johns

Crossing, Ste 170, Johns Creek, GA 30097; upon information and belief, Michael Siewert resides in Georgia.

27.     Defendant Angus Morrison is a former executive and/or director at NBLA and, at all times relevant to this First Amended Complaint, is an executive and/or director at CorpSavers and its alter ego, AHB, both of whom are located at 6470 E. Johns Crossing, Ste 170, Johns Creek, GA 30097; upon information and belief, Angus Morrison resides in Georgia.

28.     Defendant George Spalding is a former executive and/or director at NBLA and, at all times relevant to this First Amended Complaint, he is an executive and/or director at CorpSavers and its alter ego, AHB, both of whom are located at 6470 E. Johns Crossing, Ste 170, Johns Creek, GA 30097; upon information and belief, George Spalding resides in Georgia.

29.     Defendant Landon Jordan is a principal, owner, and/or manager of NHAI and HLS, both companies which were unincorporated at all relevant times to this First Amended Complaint; Landon Jordan is a resident of Texas.

30.     Defendant Jess Jordan was a principal, owner, and/or manager of NHAI and HLS, both companies of which were unincorporated at all relevant times to this First Amended Complaint; Jess Jordan is a resident of Texas.

31.     As part of the RICO scheme, the individually-named Defendants Landon Jordan and Jess Jordan directed their employees to contact West Virginia residents like David Knisley to sell NBLA memberships in West Virginia; Landon Jordan and Jess

Jordan have sufficient contacts with West Virginia to permit this Court's jurisdiction over them.

32.     Defendant AMLI is a New York insurer who, at all times relevant to this First Amended Complaint, was authorized to do business in the State of West Virginia and was doing business in West Virginia.

33.     Defendant Premiere Administrative Solutions, Inc. is the Third-Party Administrator for AMLI who, at all times relevant to this First Amended Complaint, was authorized to do business in the State of West Virginia and was doing business in West Virginia.

34.     This Court has personal jurisdiction over all of the Defendants and the venue is proper.

**STATEMENT OF FACTS**

**Allegations Relating to Misrepresentations to Mr. Knisley**

35.     The Plaintiff re-alleges all previous allegations and incorporates them herein by reference.

36.     Plaintiff, David Knisley, for years suffered from a severe and chronic medical condition and moved from Vienna, Virginia to Harpers Ferry, West Virginia to live with his brother, Jimmy Knisley and close family friend, Don Mock.

37.     Plaintiff previously had insurance through his former employer, but the premiums were exorbitant and he could not afford to pay under COBRA.

38.    On March 25, 2011, Mr. Knisley was watching TV when he saw an advertisement for insurance that would address his needs; that day, he called the toll-free number and left his contact information.

39.    Mr. Knisley was contacted by Sheila Sanchez who worked for Defendants Jess and Landon Jordan's call center HLS, at the direction of and pursuant to HLS's authority from NBLA, AMLI, AHB and CorpSavers.

40.    Don Mock, Mr. Knisley's close friend and roommate, gave Mr. Knisley permission to use his bankcard to make a one-time withdrawal for NBLA's initial fees with the remaining monthly dues to be paid by Mr. Knisley.

41.    Defendants' agent, Sheila Sanchez, specifically and unequivocally told Mr. Knisley that the insurance through the NBLA would cover Mr. Knisley's pre-existing medical conditions.

42.    Defendants' agent, Sheila Sanchez, promised to use Mr. Mock's account for the activation fee only and advised that NBLA would bill Mr. Knisley thereafter.

43.    AMLI appointed James Benjamin Lord, a co-worker of Sheila Sanchez at HLS as its official agent to market and sell AMLI's insurance to West Virginia residents.

44.    After obtaining Mr. Mock's account information from David Knisley, Sheila Sanchez transferred the call to Defendants' second sales agent, James Benjamin Lord.

45.   Defendants' practice was to only record the second portion of the sales call after the consumer already committed to enroll and provided the first agent the credit card or checking account information.

46.   The second part of the sales call, which was recorded, was when Defendants' sales agent would read incomprehensible disclaimers.

47.   During James Benjamin Lord's portion of the sales call, Mr. Knisley advised Mr. Lord that what he was saying was different than what Ms. Sanchez had previously told him.

48.   Plaintiffs obtained an authentic copy of the recorded portion of the call, which reveals that the following misrepresentations were made:

> JBL:   All right, we are being recorded now and today's date is March 25th 2011.  We welcome you as a new member to the National Better Living Association and a great choice selecting the NBLA 1,000 plan for membership. And we just have a few questions to insure that you fully understand your NBLA membership and the information we have for you is accurate. Your last agent on our record for your enrollment is Ben Lord and that's me who has just reviewed the insured benefits of your plan and the rates with you. To confirm, please say yes.

> Knisley:   Yes.

> . . .

> JBL:   Please understand that coverage is not provided for loss due to any preexisting conditions for 12 months from the effective membership date for the limited supplemental plan specifically if you have had care rendered or prescribed by a physician within the last 6 months leading up your effective date, you have a waiting period for 12 months before any claims related to that condition will be covered. However, if you have enrolled in the medical policy considered creditable coverage under the health and accountability act, otherwise known as HIPPA, and the coverage has terminated less

10

than 63 days prior your the effective date, you can provide a certificate of credible coverage in the total time spent in enrollment previous plan will count towards any waiting period. To confirm, please say yes.

Knisley:   Yes.

JBL:   You can however immediately use all other defined benefits on this plan including the PPO network, pre-negotiated rates for doctors, telemedicine prescription drug benefit, hospital negotiation services and more. To confirm, please say yes.

Knisley:   Yes.

. . .

JBL:   Uh please understand that there's discrepancy between what the agent told you about the actual plan and what the actual policy states. The policy terms apply. To confirm, please say yes.

Knisley:   What do you mean there's a discrepancy?

JBL:   Well, if there was anything that was said that was wrong and about the plan then what the actual policy states, the policy terms apply. You're speaking with the agent, okay? Between what the agent told you.

Knisley:   Alright, I know. But you're saying everything so fast I can't understand. It sounds like kind of like... it's a bit different from what she was saying. But that's okay I'm just trying to understand everything. I mean you do...this does cover preexisting injury right?

JBL:   Right. You can go see your doctor for your preexisting condition immediately, okay? Are you taking medication for your preexisting condition?

Knisley:   Yes I am.

JBL:   Okay. That benefit does not fall underneath our waiting period either so you can still take the medication…

Knisley:   You say that so fast it sounds like you're saying you don't cover it. I understand. I'm sorry I don't mean to interrupt you. I want to make

sure I understand. I don't want, you know, to mislead you in any way.

49.     James Benjamin Lord also contradicted Ms. Sanchez's promise to Mr. Knisley that he could pay his monthly premiums through the mail as opposed to direct withdrawals by NBLA:

JBL:        As with any major decision you make we encourage you not cancel on your current health plan that you have in place until you have received and reviewed your NBLA program and if you have any questions on any features programs or benefits in your NBLA membership please call our licensed agents customer service. They will be glad to assist you. We do have you set up here for a hassle free payment plan that will automatically allow your bank or credit card to be charged each month. First months charge will be $489, which includes a one-time application fee of a hundred and ten dollars and this will be charged to your account within 24 hours of today's date. Each month after, you will be charged 379 and you also have 31 days from your effective date to review your program and receive a full refund. To confirm, please say yes.

Knisley:    Now this card…yes, but this card…I'm only using this card for this initial enrollment. Then I'll have my bank account… I can switch the bank account numbers. You can take it directly out of the bank. I thought you were going to bill me and I could send you a check.

Ben:        Now it's set up initially on a convenience factor for us and for you as well….

Knisley:    It's more convenient for me to mail you a check because I'm on disability. I don't get paid until a certain time of the month.

50.     Although James Benjamin Lord told Mr. Knisley that if he was satisfied, he could receive a full refund, this was also untrue because NBLA's $110 enrollment fee was non-refundable.

51.     Defendants' agents worked for the same telemarketer, HLS, that was profiled in an under-cover investigation by Dateline NBC, which aired on March 25, 2012.

52.     In the under-cover investigation, Dateline NBC used hidden cameras to show that employees of HLS selling NBLA memberships and AMLI coverage used false and misleading statements and high-pressure sales tactics to get consumers to enroll.

53.     Notably, within days after Dateline NBC's investigation was discovered, HLS closed its doors and its employees relocated to other businesses of Jess and/or Landon Jordan, including American Service Insurance Agency, Inc., where James Benjamin Lord and Sheila Sanchez work.

54.     When Mr. Knisley received the NBLA/AMLI insurance card, he took it into his doctor's office and learned that the card did not cover anything.

55.     On April 4, 2011, Mr. Knisley called NBLA (i.e. AHB/CorpSavers) to complain that the salespeople had misled him and he wanted to cancel his membership.

56.     On April 18, 2011, Mr. Knisley called again and spoke with an AHB/CorpSavers employee, Brandon Holmes, who advised that Mr. Knisley must sign and return a cancellation form to cancel his membership.

57.     Mr. Knisley objected, stating that this was a delay tactic and that NBLA would "lose" the form and not cancel during the introductory period; he demanded that his membership be cancelled immediately.

58.     Brandon Holmes advised that he cancelled Mr. Knisley's membership, effective immediately.

59.     Notwithstanding, NBLA continued to make unauthorized deductions from Don Mock's checking account on the average of $385.83 a month through to January of 2013.

60.     Mr. Knisley was never sent anything to advise him of his continued membership after he was led to believe he cancelled and before his hospitalization on or about February 23, 2012, when he had an extreme allergic reaction to a drug protocol he was administered for his chronic medical condition.

61.     While in the hospital, Mr. Knisley contracted MRSA, and required several additional weeks of hospitalization and outpatient treatment throughout the spring of 2012.

62.     Plaintiff's hospital stay and outpatient care resulted in medical bills totaling more than $100,000, more than $58,000 of which Mr. Knisley paid out-of-pocket.

63.     Because the Plaintiff did not know that he had AMLI coverage, he did not provide the hospitals with an insurance card as he had been led to believe that the membership had been cancelled.

64.     Because Don Mock did not routinely review his monthly checking account statements, he did not realize that NBLA had been making unauthorized withdrawals from his account until he reviewed his December 2012 statement.

65.     On December 11, 2012, Don Mock called NBLA (i.e. AHB/CorpSavers) to inquire as to why NLBA was making unauthorized withdrawals; Don Mock demanded a full refund.

66.     After investigating the matter, the NBLA/AHB/CorpSavers employee subsequently advised Don Mock that David Knisley authorized the withdrawals and thus, Don Mock would not be refunded any membership dues.

67.     On or about January 8, 2013, Don Mock told David Knisley about the unauthorized charges and because NBLA refused to refund the money, Mr. Knisley had coverage and he should make a claim for his medical bills.

68.     On January 8, 2013, Mr. Knisley called NBLA and was connected with Tavorice Smith, who was an AHB/CorpSavers employee, although he identified himself as an NBLA employee.

69.     Mr. Knisley demanded that NBLA refund Mr. Mock the more than $8,000 taken from his account, or to pay Mr. Knisley's enormous medical expenses; NBLA could choose.

70.     Tavorice Smith advised that the NBLA premiums were non-refundable and he connected Mr. Knisley with a representative of AMLI, who, upon information and belief, was employed by AMLI's Third-Party Administrator, Premiere Administrative Solutions, Inc. (PAS).

71.     When Mr. Knisley reported his claim to the AMLI/PAS representative, he was advised that his claim would be denied as untimely, although this is an improper basis for denial under West Virginia Ins. Reg. § 114-14-4.4.

72.     Mr. Knisley advised the AMLI representative that he could not have reported the claim earlier because he did not know that his AMLI policy was in place.

73.     Mr. Knisley was hospitalized in 2012 for 37 days, and under the AMLI policy, he was entitled to a minimum of $1,000 per day for up to 30 days, or $30,000. **(Exhibit J)**

74.     AMLI failed to send Mr. Knisley anything on the April 15, 2012 renewal date, which would have alerted him to his continuing coverage during the 90-day reporting period for the insurance claim; AMLI is estopped from denying Plaintiff's claim for this reason.

75.     Defendants advised Mr. Knisley on January 8, 2013, that Mr. Mock would neither be refunded the membership dues nor would Mr. Knisley receive coverage for his medical debt.

76.      Mr. Knisley was also advised that in order for his NBLA membership to be cancelled, he would have to send in the NBLA cancellation form, as verbal request for cancelation was insufficient.

77.     NBLA's cancellation form contains misleading information meant to intimidate members from cancelling their membership on the basis of the member's pre-existing conditions. (**Exhibit K**, *filed under seal*).

78.     NBLA could have recorded its members' requests for cancellation, rather than unnecessarily dragging out the cancellation process; Defendants purposefully delayed cancellation in order to continue collecting dues.

79.     NBLA's cancellation form is evidence that NBLA was a "front" for Defendants' insurance scheme, as the cancellation form focused only on the alleged consequences of insurance cancellation. *Id.*

16

80.     In May of 2013, Mr. Knisley's counsel contacted NBLA to discuss Mr. Knisley's membership and claim.  (A copy of May 7, 2013 letter confirming the conversation is attached as **Exhibit L**).

81.     On May 10, 2014, John Oxendine, Esq. on behalf of NBLA called Mr. Knisley's counsel and advised that NBLA had no record of Mr. Knisley making a medical claim with AMLI; this was false as NBLA's records dated January 8, 2013 show that Mr. Knisley reported his claim to AMLI and NBLA.

82.     On May 14, 2013, John Oxendine, Esq. on behalf of NBLA confirmed in writing his oral representation that NBLA had no record of Mr. Knisley making a medical claim with AMLI but this statement was untrue.

83.     John Oxendine, Esq.'s misrepresentations on behalf of NBLA, AHB, CorpSavers, and the co-conspirators are separate predicate acts of mail and wire fraud under the RICO Act.

84.     On May 28, 2013, Mr. Knisley's counsel disputed NBLA's misrepresentations concerning Mr. Knisley's claim. (Find correspondence attached as **Exhibit M**).

85.     On May 23, 2013, Mr. Knisley's counsel contacted an AMLI/PAS representative to discuss the claim and was advised that a HIPAA authorization had to be submitted first.

86.     After providing AMLI a HIPPA authorization, on June 18, 2013, Mr. Knisley's counsel provided AMLI bills of more than $100,000 and requested reimbursement under the AMLI policy.

87.     In a letter dated July 18, 2013, AMLI confirmed in writing that it was denying Mr. Knisley's claim on the basis of untimeliness although this is an improper basis under W.Va. Ins. Reg. §114-14-14.4.

88.     To the extent that AMLI's misrepresentation was an attempt to defraud the Plaintiff of benefits owed under the policy, this is a separate predicate act of mail fraud under the RICO Act.

89.     In the July 18, 2013 letter, AMLI asserted that it was cancelling Mr. Knisley's coverage after-the-fact, and refunding Mr. Knisley $1,928.60, a small fraction of the more than $8,000 that Mr. Knisley owed Mr. Mock.

90.     It was self-serving and a breach of contract for AMLI to rescind coverage after a proper claim was made under the policy; AMLI was elevating its financial interests above that of Mr. Knisley and to his detriment in bad faith.

91.     AMLI's alleged attempt to refund to Mr. Knisley only $1,928.60 out of the more than $8,000 in premiums for the NBLA membership, would not make him whole for his losses.

92.     The $1,928.60 check that AMLI asserted that it sent to Mr. Knisley would not come close to compensating Mr. Knisley for the coverage owed for the hospital bills.

93.     What's more, Mr. Knisley disputes that AMLI sent him a check as he never received a check and did not cash such a check.

94.     If AMLI is correct that it tried to send a check for $1,928.60 to Mr. Knisley directly, without his attorney's foreknowledge or consent, this would be sanctionable misconduct under *Kocher v. Oxford Life Insurance Co.,* 602 SE 2d 499 (W.Va. 2004) and

*State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders,* 697 SE 2d 139 (W.Va. 2010).

### Allegations Against All Defendants

95.     The Plaintiff re-alleges all previous allegations and incorporates them herein by reference.

96.   Sometime in 2006 or before, Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, and George Spalding devised a scheme whereby they would use their closely-held companies, CorpSavers, NLBA, and AHB, to obtain and sell medical discount cards to desperate and unsuspecting consumers who would be led to believe that they were purchasing comprehensive health insurance.

97.     Prior to 2006, Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison and George Spalding, all held positions as executives and/or directors at the closely held companies, NBLA, AHB, and CorpSavers.

98.     In 2006, AHB's restated Articles of Incorporation stated that its business purpose was to become a medical care discount card provider.

99.     In December of 2006, NBLA became a non-profit association and expanded its membership offerings to include various levels of insurance coverage.

100.     AHB and CorpSavers continue to share the same office space, the same executives and directors, the same work staff, they comingle their assets, and neither company holds regular board meetings or observes corporate formalities; AHB is an alter ego of its parent, CorpSavers.

101.     Between 2006 and 2009, NBLA also shared the office with AHB and

CorpSavers, NBLA had the same executives and directors as AHB and CorpSavers, the same work staff, and NBLA did not hold regular board meetings or observe corporate formalities.

102.    Since 2006, NBLA has been understaffed and underfunded and is a mere shell; NBLA is an alter ego of AHB and CorpSavers.

103.    When Defendants Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison and George Spalding devised their insurance scheme, they chose to use NBLA's "non-profit" status to give NBLA an air of legitimacy and hide its true purpose as a façade for Defendants' insurance scam.  Cached webpages of the parent company, CorpSavers, show that the for-profit company sold similar junk insurance to consumers before it reorganized its subsidiaries, AHB and NBLA, to take over its direct marketing and sales. (**Exhibit N**).

104.    The owners/directors of CorpSavers knew that consumers would trust NBLA as an "honest broker" because its advertised purpose was not to make a profit, but to promote wellness.

105.    Within months of becoming a non-profit in 2006, NBLA signed a delegating agreement with AHB effective March 5, 2007, where AHB would run NBLA's day-to-day operations and keep NBLA's profits. (**Exhibit O**, *filed under seal*).

106.    When George Spalding was President of NBLA and signed the delegating agreement with AHB, he was also an executive and/or director with AHB.

107.    The other signatory on the delegating agreement was G. Daniel Siewert, III, CEO of AHB, who was previously an executive and/or director at NBLA.

108.    Pursuant to the 2007 profit-sharing agreement between NBLA and AHB, the non-profit NBLA would received only $6.00 out of the several hundreds of dollars members paid each month. (**Exhibit P**, *filed under seal*).

109.    Defendants Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison and George Spalding used the delegating agreement to funnel NBLA's enormous profits into their closely held companies, AHB and CorpSavers.

110.    Between 2011 and 2013, Mr. Knisley's unauthorized NBLA membership dues ranged from $379.00 to $396.00 a month although AMLI's insurance coverage only cost on average $85.00 a month.

111.    The majority of the membership dues were retained by the executives and/or directors of AHB and CorpSavers, and their co-conspirators, Jess Jordan and Landon Jordan, who owned and/or operated the telemarketing firms that sold the NBLA memberships.

112.    In 2007, CorpSavers, the parent company of AHB, entered into a marketing agreement with Jess Jordan on behalf of National Health Care Advisors, Inc., to cover marketing for NBLA.

113.    The fact that CorpSavers entered into a marketing agreement on behalf of NBLA instead of AHB, to whom NBLA allegedly delegated such duties, is evidence that AHB and CorpSavers are alter egos.

114.    In 2009, Defendants Timothy Siewert, G. Daniel Siewert, III, Michael Siewert, Angus Morrison, and George Spalding hired John Fabbrini to replace George Spalding as President of NBLA, and moved NBLA out of the office that it shared with

AHB and CorpSavers, to give NBLA the appearance that it was a separate entity when it was not.

115.    The RICO co-conspirators installed Mr. Fabbrini to be a figurehead, as they never relinquished control over NBLA. The extent to which the RICO co-conspirators still ran NBLA was made clear during NBLA's first board meeting where  G. Daniel Siewert, III, as former director of NBLA and current CEO of AHB, was in all practical respects, still in charge of NBLA. (See **Exhibit Q**, filed under seal).

116.    Landon Jordan and Jess Jordan owned and/or operated the call center called Health Lead Systems, Inc. ("HLS"), where Sheila Sanchez and James Benjamin Lord worked and where the fraudulent misrepresentations to Mr. Knisley took place.

117.    With the help of the telemarketers provided by Landon Jordan, Jess Jordan, NHAI and HCS, NBLA's membership grew to more than 50,000 by 2011.

118.    By 2011, CorpSavers, the alter ego of AHB, increased its sales from less than $1,000,000 dollars to more than $20,000,000 dollars, according to co-conspirator Timothy Siewert's "Linked In" page, attached as **Exhibit R.**

119.    CorpSavers, AHB, and NBLA, failed to truthfully account for all of the money that the companies earned between 2007 and 2011 in their federal and state tax filings.

120.     Defendant AMLI also played a significant part in the insurance scheme because in 2010, AMLI chose to underwrite NBLA despite the fact that it was not a legitimate bona fide wellness organization.

121.   AMLI knew that the call centers owned and/or operated by Landon Jordan and Jess Jordan would misrepresent the type and scope of AMLI's coverage.

122.   In furtherance of the insurance scheme, Defendants jointly and severally required the telemarketers to obtain direct access to a consumer's credit card or checking account information so that Defendants could make automatic withdrawals from the consumers' accounts.

123.   As part of the insurance scheme, Defendants made it difficult for members to cancel their membership by requiring that cancellations be in writing when there was no legitimate purpose for this; Defendants could have voice-recorded cancellations just as they voice-recorded enrollments.

124.   NBLA's form for cancellation was intended to mislead and intimidate members from cancelling, so as to prolong the payments for AMLI's worthless coverage. (See **Exhibit K**).

125.   Despite declaring itself a non-profit in 2006, NBLA was not approved by the IRS for 501(c)(4) tax-deferred status until September 18, 2014.  (See Exemption letter attached as **Exhibit S**, *filed under seal*).

126.   Although Federal Law requires tax-exempt organizations to produce its exemption application and all supporting documents upon request, as public records, NBLA does not maintain a complete copy, as one would expect from a legitimate organization.  (See NBLA's incomplete exemption application attached as **Exhibit T**, *filed under seal*).

127.    NBLA misled regulators into granting it tax exempt status by changing its accounting practices in 2011 to appear as though NBLA retained and managed the money made through the sale of NBLA memberships, although the money was actually funneled into the Defendants' coffers.  (See **Exhibit T**, filed *under seal*).

**Count I – Count One – Violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962 (c) and 1962 (d)) (Allied Health benefits, Inc., Health Benefits, Inc., CorpSavers Healthcare, G. Daniel Siewert, III, Timothy Siewert, Michael C. Siewert, Angus Morrison, George Spalding, Landon Jordan, and Jess Jordan)**

128.    Plaintiff herein incorporates all allegations above.

129.    This claim is asserted against above named Defendants under 18 U.S.C. §§ 1962 (c) and (d) of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

130.    At all relevant times, above named RICO Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3), as each Defendant was "capable of holding a legal or beneficial interest in property."

131.    At all relevant times, RICO Defendants used NBLA as a corporate "Enterprise" within the meaning of 18 U.S.C. § 1961(4) to perpetrate fraud on vulnerable consumers.

132.    Each of the RICO Defendants profited from its management of the Enterprise.

133.    Each of the RICO Defendants helped to direct the different aspects of the Enterprise's actions and manage its affairs.

24

134.    Each of the RICO Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

135.    RICO Defendants committed multiple predicate acts of racketeering through the NBLA Enterprise, including mail fraud, wire fraud, and bank fraud in violation of 18 U.S.C. §§ 1341,1343 and 1344.

136.    The RICO Defendants orchestrated a scheme of mail and wire fraud through NBLA (RICO enterprise) to defraud the Plaintiff and others.

137.    The scheme involved the suppression of information, lies, fraudulent misrepresentations and omissions all calculated to deceive consumers of ordinary prudence and comprehension.

138.    The Enterprise (NBLA) executed the scheme through a series of predicate acts through the United States mail and through transmissions by wire communications including e-mails, telephone calls, and television advertisements, as pled above with specificity above.

139.    The Enterprise also committed bank fraud (18 U.S.C. §1344) by obtaining funds, owned by Mr. Mock, under the custody or control of his financial institution, by means of false or fraudulent pretenses, representations, or promises.

140.    Pursuant to *United States vs. Adepoju,* 756 F.3d 250 (4th Cir.2014), a banking institution does not itself need to be the victim of the bank fraud for the fraud to constitute a predicate act under 18 U.S.C. §1344.

141.    The Defendants' violations of 18 U.S.C. §§ 1962 (c) and (d) have directly and proximately caused Plaintiff to incur significant injuries including a debt owed to Mr. Mock of over $8,000 as well as many thousands of dollars in unpaid medical debt.

142.    The Defendants each, as a result of their participation in the racketeering Enterprise, have received money from the ill-gotten gains of the Enterprise.

143.    Under the provisions of 18 U.S.C. § 1964 (c), the Plaintiff is entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees; and equitable relief, pursuant to 18 U.S.C. § 1964(a), in the form of disgorgement of profits, and assets.

### Count II – Violations of the West Virginia Unfair Trade Practices Act
### (American Medical and Life Insurance Company and
### Premiere Administrative Solutions)

144.    Plaintiff herein incorporates all allegations above.

145.    In the handling of the Plaintiff's insurance claim and as a general business practice, the Defendants have jointly and severally committed multiple violations of W. Va. Code § 33-11-1 et seq., and the insurance regulations promulgated thereunder.

146.    AMLI and PAS violated W. Va. Code §33-11-4(9)(a) by misrepresenting pertinent facts and insurance policy provisions relating to Plaintiff's insurance coverage.

147.    AMLI and PAS violated W. Va. Code §33-11-4(9)(b) by failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

148.    AMLI and PAS violated W. Va. Code §33-11-4(9)(b) by failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

149.    AMLI and PAS violated W. Va. Code §33-11-4(9)(d) by refusing to pay claims without conducting a reasonable investigation based upon all available information.

150.    In the present case, Defendants violated provisions of W. Va. CSR § 114-14-1 *et seq.* to include the following:

3. File And Record Documentation.  The insurer's claim files shall be subject to examination by the Commissioner or by his or her duly appointed designees. Such files shall contain all notes and work papers pertaining to the claim in such detail that pertinent events and the dates of such events can be reconstructed. All communications and transactions emanating from or received by the insurer shall be dated by the insurer. A notation of the substance and date of all oral communications shall be contained in the claim file. Insurers shall either make a notation in the file or retain a copy of all forms mailed to claimants.

4.1. No person may knowingly fail to fully disclose to first-party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented.

4.2. Concealment of pertinent policy provisions.  -- No person may knowingly conceal from first-party claimants benefits, coverages or other provisions of any insurance policy or insurance contract when such benefits, coverages or other provisions are pertinent to a claim.

4.3. Coercive statements.  -- No person may make statements which indicate that the rights of a claimant may be impaired if a form or release is not completed within a given period of time unless the statement is given for the purpose of notifying the claimant of the provisions of a statute of limitation or of a policy or contract time limit.

4.4. Time limit for notification of claim.  -- Except where a time limit is specified by statute or legislative rule, no insurer may require a first- party claimant to give notification of a claim or proof of claim within a specified time.

5.1. Acknowledgment of notices of claims. -- Every insurer, upon receiving notification of a claim shall, within fifteen (15) working days, acknowledge the receipt of such notice unless full payment is made within such period of time. If an acknowledgment is made by means other than writing, an appropriate notation of such acknowledgment shall be made in the claim file of the insurer and dated. Notification given to an agent of an insurer shall be notification to the insurer.

5.4. Provisions of assistance to first-party claimants. -- Every insurer, upon receiving notification of a claim, shall promptly provide necessary claim forms, instructions, and reasonable assistance so that first-party claimants can comply with the policy conditions and the insurer's reasonable requirements. Compliance with this subsection within fifteen (15) working days of notification of a claim constitutes compliance with subsection 5.1. of this section.

6.1. Investigation of claims. -- Every insurer shall promptly conduct and diligently pursue a thorough, fair and objective investigation and may not unreasonably delay resolution by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute.

6.3. Duty after investigation. -- Within ten (10) working days of completing its investigation, the insurer shall deny the claim in writing or make a written offer, subject to policy limits[.]

6.5. Denial of claims. -- No insurer may deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to such provision, condition or exclusion is included in the denial. The denial must be given to the claimant in writing or as otherwise provided in subsection 6.6. of these rules.

6.6. Records of denial of claims. -- If a denial of a claim is made by any other means than writing, an appropriate notation shall be made in the claim file of the insurer.

151.    The Defendants violated the above referenced provisions of W. Va. Code §33-11-4(9), and the insurance regulations promulgated thereunder, as a general business practice in this and other claims.

152.    As a direct and proximate result of the Defendants' violations of W. Va. Code § 33-11-1 et seq., and the insurance regulations promulgated thereunder, Plaintiff was harmed and is entitled to recover economic and non-economic damages, including attorney's fees and expenses in the handling of Plaintiff's claim.

153.   Defendants' illegal acts and omissions in handling the Plaintiff's claim amount to willful, wanton and malicious conduct that also entitles the Plaintiff to punitive damages.

## Count V – Fraud (AMLI, PAS, and NBLA/CorpSavers/AHB)

163.   The Plaintiff re-alleges all previous allegations and incorporates them herein by reference.

164.   NBLA/CorpSavers/AHB also made false statements concerning the cancellation of the Plaintiff's enrollment in the NBLA plan.

165.    As a direct and proximate cause of the Defendants' false statements and concealment of material facts, as set forth above in the preceding paragraphs of this Amended Complaint, the Plaintiff, having reasonably relied on the false information, has suffered injury and is entitled to all damages allowed by law, including punitive damages.

## Count VI – Indemnification

166.   The Plaintiff re-alleges all previous allegations and incorporates them herein by reference.

167.   Equity requires David Knisley to repay Don Mock the more than $8,000 dollars that was taken from Mr. Mock's checking account, as it was Mr. Knisley's NBLA membership that caused Don Mock's losses.

168.   Mr. Mock should not have to pay for Mr. Knisley's NBLA membership when Mr. Mock would never obtain benefits therefrom and he was not to pay for such membership dues.

169.    Defendants made unauthorized withdrawals from Mr. Mock's account in violation of Mr. Knisley's expectations, against his instructions, and despite Defendants' promise to cancel the membership.

170.    Defendants are required to indemnify David Knisley for the monthly dues that were withdrawn from Don Mock's account, which David Knisley must then reimburse to Don Mock.

### Demand

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.      Damages and compensation in an amount to be determined by a jury.

2.      Damages pursuant to all of the relevant state statutory damages claims asserted herein.

3.      Treble damages pursuant to 18 U.S.C. § 1964 (c).

4.      Disgorgement of profits pursuant to 18 U.S.C. § 1964 (a).

5.      Punitive damages.

6.      Pre and post-judgment interest and all costs, as provided by law.

7.      Plaintiff's reasonable attorneys' fees and costs.

8.      Such other and further relief as the Court deems equitable, just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**.


**<u>DAVID KNISLEY</u>**
**BY COUNSEL**


<u>/s/ Laura C. Davis</u>
Laura C. Davis (WV No. 7801)
Andrew C. Skinner (WV No. 9314)
Stephen G. Skinner (WV No. 6725)
Skinner Law Firm
Counsel for Plaintiff
P.O. Box 487
Charles Town, WV 25414
(304) 725-7029/(304) 725-4082
lauradavis@skinnerfirm.com